IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-11

No. 101PA15-3

Filed 11 February 2022

STATE OF NORTH CAROLINA

v.

CHRISTOPHER ANTHONY CLEGG

On discretionary review pursuant to N.C.G.S. § 7A-31 of an order entered on 15 July 2019 by Judge Paul Ridgeway in Superior Court, Wake County, based on this Court's 14 August 2018 Order, 371 N.C. 443, (2018), remanding the case to the trial court in reconsideration of defendant's *Batson* challenge and retaining jurisdiction. On 26 February 2020, the Supreme Court allowed in part defendant's supplemental petition for discretionary review. Heard in the Supreme Court on 6 October 2021.

*Joshua Stein, Attorney General, by Amy Kunstling Irene, Special Deputy Attorney General for the State-appellee.*

*Dylan J.C. Buffum Attorney at Law, PLLC, by Dylan J.C. Buffum, for defendant-appellant.*

*David Weiss and Elizabeth Hambourger, for amici curiae Common Cause and Democracy North Carolina.*

HUDSON, Justice.

Over 140 years ago, the Supreme Court of the United States held that exclusion of African Americans from juries on the basis of race violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

*Strauder v. West Virginia*, 100 U.S. 303, 310 (1880). Just over a century later, in *Batson v. Kentucky*, that same Court established a three-step process through which courts analyze claims of racial discrimination in jury selection. 476 U.S. 79, 96–98 (1986); *see Foster v. Chatman*, 578 U.S. 488, 499–500 (2016) (summarizing the *Batson* process). Today, we must decide whether the prosecutor's exclusion of an African-American potential juror constitutes a substantive violation of the defendant's constitutional right to equal protection under *Batson* when the trial court found that "both race-neutral justifications offered by the prosecutor fail." We hold that it does, and therefore reverse the ruling of the trial court below, vacate defendant's conviction, and remand the case back to the trial court for any further proceedings.

## I. Background

### A. Jury Selection and Trial

On 8 April 2014, defendant Christopher A. Clegg, an African-American man, was indicted for robbery with a dangerous weapon and possession of a firearm by a felon. Beginning on 4 April 2016, defendant was tried by a jury in Wake County Superior Court, Judge Paul C. Ridgeway presiding. During jury selection, defense counsel raised a challenge under *Batson v. Kentucky* (*Batson* challenge) after the prosecutor used peremptory strikes to remove two African-American women from the jury: Viola Jeffreys and Gwendolyn Aubrey. 476 U.S. 79. In response, the prosecutor proffered race-neutral reasons for the strikes. Specifically, the prosecutor asserted

that he struck Ms. Jeffreys and Ms. Aubrey "based on their body language[] and . . . their failure to look at me when I was trying to communicate with them." The prosecutor also claimed that he struck Ms. Jeffreys due to potential bias toward defendant arising from her previous employment at Dorothea Dix Hospital, and that he struck Ms. Aubrey due to her answer of "I suppose" in response to a question asking whether she could be fair and impartial. Defense counsel then argued that these reasons were pretextual. The trial court subsequently ruled that defendant had failed to establish that race was a significant factor in the peremptory strikes, and therefore overruled his *Batson* challenge. After the completion of jury selection and the resolution of a few other preliminary issues, the case proceeded to trial.

¶ 3    At trial, the State's evidence, as presented through several witnesses and exhibits, tended to show that in the early morning hours of 25 January 2014, defendant, brandishing a gun, robbed a sweepstakes business located at the Timber Landing Business Center in Garner, North Carolina. Defendant neither testified nor offered witnesses or evidence of his own at trial. On 6 April 2016, the jury found defendant guilty of robbery with a dangerous weapon and not guilty of possession of a firearm by a felon. Defendant was sentenced to a term of sixty-six to ninety-two months' imprisonment, with credit for 767 days of pre-trial incarceration. On 8 April 2016, defendant appealed his conviction to the North Carolina Court of Appeals.

**B.  Court of Appeals**

¶ 4 On appeal, defendant raised two issues. First, he argued that the trial court erred by overruling his *Batson* challenge. Second, he argued that the trial court erred by admitting prejudicial victim impact testimony in violation of Rules 401, 402, and 403 of the North Carolina Rules of Evidence. The State contended that the trial court had acted properly on both issues.

¶ 5 On 5 September 2017, in a unanimous, unpublished opinion, the Court of Appeals rejected both of defendant's arguments. *State v. Clegg*, 2017 WL 3863494 (N.C. Ct. App. Sept. 5, 2017) (unpublished). First, the Court of Appeals considered defendant's *Batson* challenge. The court first summarized the three-step process of a *Batson* challenge:

> First, the defendant must make a prima facie showing that the state exercised a race-based peremptory challenge. If the defendant makes the requisite showing, the burden shifts to the state to offer a facially valid, race-neutral explanation for the peremptory challenge. Finally, the trial court must decide whether the defendant has proved purposeful discrimination.

*Clegg*, 2017 WL 3863494 at *2 (citing *State v. Taylor*, 362 N.C. 514, 527 (2008), *cert. denied*, 558 U.S. 851 (2009)). The Court of Appeals noted, though, that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes

moot." *Id.* (citing *State v. Bell*, 359 N.C. 1, 12 (2004)).

¶ 6          The Court of Appeals then reviewed the trial court's handling of defendant's *Batson* challenge. "Because the trial court heard the State's reasons for striking Jeffreys and Aubrey prior to making a ruling on defendant's *Batson* objections," thus rendering the preliminary issue of defendant's prima facie case moot for *Batson* purposes, the Court of Appeals moved directly to step two: reviewing the prosecution's proffered reasons for the peremptory strikes. *Id.* at *3. As a preliminary matter, the court "note[d] that there is a discrepancy between the State's characterization of its *voir dire* of Aubrey and what the transcript reveals." *Id.* at *4. Specifically, the court noted that while the prosecutor's given rationale for striking Ms. Aubrey claimed that she had answered "I suppose" to a question about whether she could be fair and impartial, the transcript reveals that she actually gave that answer to a question about whether she was confident that she would be able to focus on the trial. Consequently, the court "review[ed] the State's argument in light of this clarification." *Id.* The court subsequently ruled that "[t]he State's concerns of both Jeffreys' and Aubrey's failure to make eye contact and their ability to be fair and focused on the trial constitute neutral explanations for each peremptory strike." Accordingly, the court found "no discriminatory intent inherent in the State's explanations and thus agree[d] with the trial court's determination that the State's justifications were race neutral." *Id.*

¶ 7        The Court of Appeals then "move[d] to the third step of the *Batson* inquiry and consider[ed] whether the trial court erred by finding that there was no *Batson* error." *Id.* at \*11. Here, the court noted defendant's argument that the proffered reasoning regarding Aubrey's ability to focus was revealed as pretextual because a white juror, David Williams, also indicated that he might be distracted from the trial due to work concerns. But "[t]he distinguishing factor between Aubrey and David Williams[,]" the court ruled, "appears to be the State's additional stated bases for striking Aubrey[:] . . . her body language and failure to make eye contact." *Id.* The court likewise dismissed defendant's argument that the prosecutor's proffered reasoning for striking Ms. Jeffreys—her previous employment at Dorothea Dix, a psychiatric hospital—was pretextual. Specifically, the court ruled that because "there was a competency evaluation of defendant ordered and defense counsel stated that she had also requested an in-custody evaluation of the defendant[,] . . . the State's basis for striking Jeffreys due to her work history is rationally related to defendant's potential competency issues." *Id.* "Moreover, [the court] note[d,] . . . the State explained that it also exercised its peremptory strike on Jeffreys based on her body language and failure to make eye contact." *Id.* "As such," the court found that "defendant has failed to carry his burden of proving purposeful discrimination[,]" and therefore held that "defendant's *Batson* challenge was properly denied." *Id.* at \*6.

¶ 8        Second, the Court of Appeals likewise ruled that the trial court did not commit

plain error by admitting the victim impact testimony of Patrice Williams, who was present at the robbery. *Id.* at \*6–7. Because defendant does not raise this issue before this Court, we do not consider it further here. In sum, the Court of Appeals held that the trial court committed no error. *Id.* at \*7.

**C. Special Order and *Batson* Rehearing**

On 10 October 2017, defendant filed a notice of appeal with this Court under N.C.G.S. § 7A-30(1), asserting that the case presented a substantial constitutional question under the Equal Protection Clause of the U.S. Constitution and Article I Sections 19 (equal protection) and 26 (jury service) of the North Carolina Constitution. In response, the State filed a motion to dismiss defendant's appeal for lack of a substantial constitutional question. Also on 10 October 2017, defendant filed a petition for discretionary review with this Court under N.C.G.S. § 7A-31(c), asserting that the case fulfilled all three of the statutory bases for discretionary review: (1) significant public interest; (2) legal principles of major significance to the jurisprudence of the State; and (3) conflict with a decision of the Supreme Court. In both the notice of appeal and petition for discretionary review, defendant focused exclusively on the *Batson* challenge issue.

On 14 August 2018, this Court responded to defendant's petition via special order. The order directed "that this case be remanded to the trial court for reconsideration of defendant's *Batson* challenge based upon the existing record and

the entry of a new order addressing the merits of defendant's *Batson* challenge in light of the United States Supreme Court decision in *Foster v. Chatman*, [578] U.S. [488], 136 S. Ct. 1737, 195 L. Ed. 1 (2016), which was decided after the trial court's decision in this case." 371 N.C. 443 (2018). The order further instructed that "[a]fter the entry of the order on remand, the trial court should certify that order to this Court, which retains jurisdiction and will undertake any necessary additional proceedings at that time." That same day, this Court allowed the State's motion to dismiss defendant's notice of appeal.

On 17 December 2018, in accordance with this Court's order, the trial court held a new hearing regarding defendant's *Batson* challenge. Judge Ridgeway, the same judge as at the initial trial, also presided over this new *Batson* hearing. In briefing and at the hearing, defense counsel (different from original trial) and the prosecutor (same as at original trial) presented arguments regarding the application of the U.S. Supreme Court's ruling in *Foster* to defendant's *Batson* challenge.

First, defense counsel argued that two findings from *Foster* "are especially important in this case": (1) "that when a prosecutor mischaracterizes a juror's answers, this is strong evidence that the justification is, in fact, pretext[;]" and (2) "that in order to prevail in step three of *Batson*, the defendant does not need to disprove each and every reason given by the prosecutor."

Both of these elements, defense counsel argued, relate directly to the State's

striking of Ms. Aubrey. First, as noted by the Court of Appeals, defense counsel argued that the prosecutor repeatedly mischaracterized Ms. Aubrey's answers by claiming that she answered "I suppose" to a question about whether she could be fair and impartial, when she actually gave that answer to a question about whether she was confident that she would be able to focus at trial. Second, defense counsel argued that because the prosecutor's first justification for the strike was shown to be pretextual, defendant did not need to undermine every other reason provided by the prosecutor, including body language and lack of eye contact. Further, defense counsel sought to undermine the prosecutor's reliance on body language and eye contact because defense counsel at trial disputed those findings and the trial court made no contemporary findings of their veracity.

¶ 14        Next, defense counsel argued that the prosecution's proffered reasons for striking Ms. Jeffreys likewise fall short. Regarding the prosecutor's "body language and eye contact" reasoning, defense counsel noted that the prosecutor always referred to Ms. Aubrey and Ms. Jeffreys collectively when discussing body language, never distinguishing between the two Black women and never offering more specific details about what exactly was troubling to him about their body language. Regarding the Dorothea Dix reasoning, defense counsel argued that "[i]f the prosecutor [was] genuinely concerned about [jurors'] experience with mental health being a disqualifying factor for him in making his peremptory strikes[,] . . . he would have

asked at least one other juror [about it]."

¶ 15    Finally, defense counsel emphasized the burden of proof in a *Batson* challenge: "the defendant needs to show…that it is more likely than not that race was a substantial motivating factor for the strike[,]" not the sole reason for the strike. Based on the evidence presented that the prosecutor's proffered reasons were pretextual, defense counsel argued that defendant had met that burden.

¶ 16    In response, the prosecutor argued that his proffered race-neutral reasons for the peremptory strikes of Ms. Aubrey and Ms. Jeffreys pass *Batson* scrutiny. First, the prosecutor noted "some very obvious distinctions between the record here and the *Foster* case," namely: (1) that the victim and witnesses here are also African American; (2) that the jury here included one juror who identified as mixed race (African-American father and Chinese mother); and (3) that the prosecutor here did not blatantly and persistently focus on race during jury selection.

¶ 17    Next, the prosecutor repeated his proffered race-neutral reasons for striking Ms. Jeffreys and Ms. Aubrey. Regarding Ms. Jeffreys, the prosecutor argued that because defendant's "mental health was an underlying issue and concern for the defense," Jeffreys's experience as a nurse to mental health patients may render her "sympathetic to the Defendant despite overwhelming evidence of his guilt." The prosecutor further noted that while all of the potential jurors were asked about their occupation, "Ms. Jeffreys was the only one who said she worked or used to work in

the mental health field."

¶ 18    Regarding Ms. Aubrey, the prosecutor again noted "her body language and her lack of eye contact." He then emphasized that her short and equivocal answers of "I suppose" and "I think so" to his questions about her ability to focus on the trial created concern regarding "whether or not she could be an engaged juror throughout this process."

¶ 19    Then, the prosecutor addressed his initial mistake regarding to which question Ms. Aubrey had answered "I suppose":

> . . . Your Honor, I'll be the first to tell you that this is the first and only time . . . I've had to address [a *Batson*] challenge. And I was completely flustered when this was brought up during trial. And it did cause me to misspeak with respect to the answer or the question that Ms. Aubrey was answering. And as [defense counsel] pointed out from the record, as part of my race neutral justification for Ms. Aubrey, I said when I asked her if she could be fair and impartial, her answer was "I suppose.". . . I wasn't confident that she was confident that she could be fair and impartial. And that's—that's the State misspeaking. That is a product of simply getting confused. That's a standard question I ask during jury selection; can somebody be fair and impartial. And I also ask can people focus on the proceedings. And that was simply confusing those questions and her answer.

¶ 20    Later, when addressing this same mistake, the prosecutor and the trial court had the following exchange:

> The [c]ourt: I think it's more misremembering than misspeaking. That's all right.

> Mr. Wiggs: Right.
>
> The [c]ourt: I mean, I think you don't—taking it in the light most favorable to you or to the prosecutor—were you the prosecutor?
>
> Mr. Wiggs: I was.
>
> The [c]ourt: Okay. Then taking it in the light most favorable, you didn't remember that the answer was given to another question rather than this question. So it's not misspeaking, it's misremembering.

¶ 21      Finally, the prosecutor noted several previous cases from this Court, the Court of Appeals, and the U.S. Supreme Court, emphasizing the low bar that prosecutors must meet in responding to a *Batson* challenge, and the wide variety of race-neutral reasons that may suffice in meeting that bar. Concluding, the prosecutor asked the trial court to again deny defendant's *Batson* challenge.

¶ 22      On 15 July 2019, the trial court issued its new order on defendant's *Batson* challenge. As requested, the court considered the race-neutral justifications offered by the prosecutor for the two peremptory strikes in question in light of *Foster*, noting that "[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose."

¶ 23      First, the trial court reviewed the prosecutor's strike of Ms. Jeffreys. The court found that the prosecutor's reasoning regarding Jeffreys's previous employment at Dorothea Dix Hospital "is supported by the record and constitutes an appropriate reason for the strike."

¶ 24        Second, the trial court reviewed the prosecutor's strike of Ms. Aubrey. Here, the court addressed the discrepancy between the prosecutor's stated reasoning and the record regarding Ms. Aubrey's "I suppose" answer:

> 7. It is evident from the record that both the trial court's and the prosecutor's memory of the answers given by Ms. Aubrey was conflated. She did not say "I suppose" in response to a question of whether she could be "fair and impartial." Rather, in answering a question from the [c]ourt as to whether there was "anything going on in your life that would make it difficult or impossible for you to serve," Ms. Aubrey said "other than missing work, no." The [c]ourt then inquired whether Ms. Aubrey worked "daytime," and Ms. Aubrey responded "day and night." Shortly thereafter, the prosecutor asked Ms. Aubrey the following questions:
>
> *Prosecutor*: Okay. Ms. Aubrey, do you feel confident you can focus on what's going on here?
>
> *Ms. Aubrey*: I suppose.
>
> *Prosecutor*: I want you to be confident about it. You just don't want to be a juror, or do you feel like if you were here, you could focus and do what we need you to do?
>
> *Ms. Aubrey*: I think so.
>
> 8. In retrospect, had the prosecutor, in offering his race-neutral basis for exercising the strike of Ms. Aubrey, stated that he was concerned that she had answered "I suppose" to the question of whether she could focus, when coupled with her concern that she worked "day and night" and would miss work, that, in the [c]ourt's view, would have constituted a neutral justification for the strike.
>
> 9. However, as it stands, the State's offered reason for striking Ms. Aubrey based on her "I suppose" answer is not

supported by the record because the prosecutor associated that answer with whether she could be "fair and impartial," not whether she could focus.

10. The *Foster* Court instructs that when reasons that are offered by a prosecutor as a basis for exercising a strike contradict or mischaracterize the record, those reasons must be rejected in evaluating whether race was a motivating factor in exercising a strike. *Foster*, *supra*, at 1750 (prosecutor's reasons were "contradicted by the record"); 1753 (prosecutor's justifications were "mischaracterization of the record"); 1753 ("[m]any of the State's secondary justifications similarly came undone when subjected to scrutiny").

11. Moreover, a trial court is not permitted to consider race-neutral reasons for exercising a strike that are not articulated by the prosecutor. *Miller-El v. Dretke*, 545 U.S. 231, 250–52 (2005) ("If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false. The Court of Appeals's and the dissent's substitution of a reason for eliminating Warren does nothing to satisfy the prosecutors' burden of stating a racially neutral explanation for their own actions.")

12. Strict application of the rules articulated in *Foster* and *Miller-El* to the race-neutral (but mis-remembered) reasons provided by the prosecutor justifying Ms. Aubrey's strike would require the [c]ourt to exclude and not consider the reason articulated by the prosecutor – that Ms. Aubrey said that "she supposed" she could be fair and impartial – because that reason is contradicted by the record.

After thus rejecting the "I suppose" rationale for Ms. Aubrey's strike, the trial court then considered "the only [remaining] race-neutral reason articulated by the prosecutor[:] . . . the 'body language' and 'lack of eye contact' rationale." Here, the

court noted that "[t]he 'body language' rationale was disputed by trial counsel for the defendant, and the trial court made no specific findings regarding Ms. Aubrey's body language or demeanor." The court then noted that this "circumstance is similar to one that arose in *Snyder v. Louisiana*, 552 U.S. 472 (2008)," in which the U.S. Supreme Court rejected the validity of a peremptory strike of an African-American juror on the basis of alleged "nervousness" when "the record does not show that the trial judge actually made a determination concerning [the potential juror's] demeanor." *Snyder*, 552 U.S. at 479. "Hence," the trial court stated, "without findings of fact by the trial court, the *Snyder* Court appears to instruct that for appellate purposes the 'body language' race-neutral justification offered by the prosecutor cannot be viewed as sufficient." "As such," the trial court ruled, "both race-neutral justifications offered by the prosecutor fail—one because the prosecutor mis-remembered the question to which Ms. Aubrey responded 'I suppose,' and the other because the trial court failed to make sufficient findings of fact to establish a record of Ms. Aubrey's body language."

¶ 26        Next, the trial court reviewed the arguments presented by defendant that the State's peremptory strikes constitute a *Batson* violation. First, the court noted defendant's statistical evidence regarding jury selection in this case. Specifically, the court observed:

> Three of the 22 venire members were non-white. The
> prosecutor used 4 of 7 peremptory strikes allotted to each

party by statute. Among those venire members whom the State struck, 2 were African[-]American women. Hence, the State struck 2 of the 3 non-white members of the venire, which also turned out to be all the non-white female venire members. The remaining two peremptory strikes exercised by the State were of white males.

The trial court then considered "[t]he evidence proffered by the [d]efendant relating to statewide disparities in the exercise of peremptory challenges[.]" Specifically, the court observed "that in non-capital cases studied from 2011-2012, [North Carolina] prosecutors struck black venire members at about twice the rate of white" (citing D. Pollitt & B. Warren, *Thirty Years of Disappointment: North Carolina's Remarkable Appellate Batson Record*, 94 N.C. L. Rev. 1957, 1964 (2016)).

Next, the trial court considered defendant's side-by-side comparison of the questioning of white and Black potential jurors regarding their ability to focus during trial. Specifically, regarding the allegedly disparate questioning of Mr. David Williams and Ms. Aubrey on this issue, the court "[did] not find this side-by-side comparison particularly pertinent because Mr. Williams had previously stated that, with respect to his supervisory duties, 'I can juggle things around,' whereas Ms. Aubrey did not indicate any flexibility in her 'day and night' work schedule that might ease her concern about missing work."

Finally, the trial court turned to the third step of the *Batson* analysis: "determin[ing] whether the defendant has shown purposeful discrimination" (internal citation omitted). Again, the trial court ruled that "[d]efendant has shown

that the race-neutral justifications offered by the prosecutor cannot be supported by the record—either because the prosecutor mis-remembered the potential juror's answer or because the trial court failed to make an adequate record of the body language of the prospective juror." Further, the court noted that "[t]he [d]efendant has also shown evidence of statistical disparities in the exercise of peremptory challenges by prosecutors in statewide jury selection studies in data collected from 1990 to 2012."

¶ 30          The trial court then stated its ultimate conclusion:

> However, the [c]ourt cannot conclude from this record that in this case, the State has engaged in "purposeful discrimination." As the [d]efendant points out, the applicable standard is, given all relevant circumstances, "whether it was more likely than not that the challenge was improperly motivated." *Johnson v. California*, 545 U.S. 162, 170 (2005). Even on this relaxed "more likely than not" standard, this [c]ourt concludes that essential evidence of purposeful discrimination—which is the [d]efendant's burden to prove—is lacking.

¶ 31          In support of this conclusion, the trial court noted that "[t]he cases in which the [U.S.] Supreme Court has found that the state exercised peremptory challenges in a purposefully discriminatory fashion are strikingly different from the case at hand." By way of example, the court noted that both *Foster* and *Miller-El* included glaring evidence of racial discrimination by prosecutors, including: (1) a finding that the prosecutor's explanations were "misrepresentations" and "contradicted by the record," *Foster*, 578 U.S. at 505; (2) "a jury list . . . found in the prosecutor's file with

each black prospective juror highlighted in bright green," *id.* at 1744; (3) Black prospective jurors being subjected to a "trick question" that was not asked of white prospective jurors, *Miller-El*, 545 U.S. at 255; and (4) "a specific policy [in the prosecutor's office] of systematically excluding blacks from juries" evidenced by a training manual that "outlined the reasoning for excluding minorities from jury service." *Id.* at 266.

¶ 32    By comparison, the trial court found "this case . . . markedly distinguishable from the facts of this controlling authority."  Specifically, the court noted:

> Unlike that authority, here the direct evidence of purposeful discrimination is not a "mischaracterization" of the record with "no grounding in fact." Rather, it appears to be an instance of a prosecutor mis-remembering whether the prospective juror had said "I suppose" in responding to a question of whether she could be fair and impartial, or whether she could focus given her "day and night" employment and concern about missing work. And, unlike the controlling authority, no evidence has been presented of a systemic policy of the prosecutor's office to exclude black jurors, or of a trial strategy in this specific case to exclude black jurors. In other words, the [c]ourt concludes that the quantum of evidence in this case, both direct and circumstantial, is insufficient to support the conclusion that the prosecutor engaged in purposeful discrimination by excluding 2 of 3 non-white jurors.

¶ 33    Therefore, the trial court concluded "that defendant has not established that it is more likely than not that the State engaged in purposeful discrimination in excluding prospective jurors Jeffreys and Aubrey[.]" Accordingly, "the [c]ourt again order[ed] that [d]efendant's *Batson* objections must be OVERRULED." Finally, in

accordance with this Court's 14 August 2018 Order, the trial court forwarded its order to this Court for further proceedings.

¶ 34        On 23 August 2019, defendant filed a supplementary petition for discretionary review with this Court based on the trial court's rehearing order. In this petition, defendant argued that this Court should "summarily reverse the trial court's order, vacate the judgments and order a new trial because the record unequivocally demonstrates that the State failed to meet [its] burden to proffer a race neutral reason" for its peremptory strike of Ms. Aubrey. Alternatively, defendant argued that "this Court should certify the decision below for plenary review because this case presents important principles of *Batson* jurisprudence" and "presents the perfect vehicle to review the appropriate standard [for] evaluating the evidence at trial and [the] standard of review on appeal." On 26 February 2020, this Court denied defendant's request for summary reversal but allowed his petition "for the purpose of affording plenary review of the issues raised in that petition."

¶ 35        Before this Court, defendant argued that the trial court erred in finding that he "failed to meet his burden to show purposeful discrimination because the State failed to articulate a reason for the peremptory strikes of Black jurors that was legitimate, facially valid[,] reasonably specific[,] or related to the case to be tried." Defendant further contended that the trial court clearly erred by "viewing the evidence in the light most favorable to the state," and ignoring or justifying evidence

from which improper discriminatory intent could be inferred.

¶ 36    In response, the State argued that: (1) it had given facially valid, race-neutral reasons for its peremptory challenges at step two of the *Batson* test; and (2) the trial court did not clearly err at step three of the *Batson* test by overruling defendant's *Batson* objection. The parties elaborated upon these points at oral arguments before this Court on 6 October 2021.

## II.    Analysis

¶ 37    Now, we must consider whether the trial court's ruling regarding defendant's *Batson* challenge was clearly erroneous. *See Snyder*, 552 U.S. at 477 ("On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous"); *State v. Chapman*, 359 N.C. 328, 339 (2005) ("Thus, the standard of review is whether the trial court's [*Batson*] findings are clearly erroneous"). Such "clear error" is "deemed to exist when, on the entire evidence[,] the Court is left with the definite and firm conviction that a mistake has been committed." *State v. Bennett*, 374 N.C. 579, 592 (2020) (cleaned up). In order to make this determination, we first summarize the applicable history and precedent regarding racial discrimination in jury selection and *Batson* challenges.

### A. *Batson* History and Precedent

¶ 38    Juries are at the heart of our constitutional democracy. *See* U.S. Const. amend. VI (establishing the right to a jury in criminal trials); U.S. Const. amend VII

(establishing the right to a jury in civil suits); *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968) (noting "that trial by jury in criminal cases is fundamental to the American scheme of justice . . ."). Principally, juries "safeguard[] a person accused of crime against the arbitrary exercise of power by a prosecutor or judge." *Batson*, 476 U.S. at 86 (citing *Duncan*, 391 U.S. at 156). More broadly, though, jury service also "affords ordinary citizens a valuable opportunity to participate in a process of government, an experience fostering, one hopes, a respect for law." *Powers v. Ohio*, 499 U.S. 400, 407 (1991) (citing *Duncan*, 391 U.S. at 187 (Harlan, J., dissenting)). "Indeed, with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process." *Id.*

¶ 39    Because juries are so fundamental to our system, racial discrimination in jury selection is deeply harmful. "Purposeful racial discrimination in the selection of the venire . . . denies [a criminal defendant] the protection that a trial by jury is intended to secure." *Batson*, 476 at 86; *see also Miller-El*, 545 U.S. at 237 ("Defendants are harmed, of course, when racial discrimination in jury selection compromises the right of trial by impartial jury."). In addition to the defendant, such discrimination also harms the excluded juror, who is unduly denied the civic responsibility and opportunity of jury participation. *See Batson*, 476 U.S. at 87 (noting that "by denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror"). Even more broadly,

"[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." *Id.* "That is, the very integrity of the courts is jeopardized when a prosecutor's discrimination invites cynicism respecting the jury's neutrality and undermines public confidence in adjudication." *Miller-El*, 545 U.S. at 238 (cleaned up). In short, racial discrimination in jury selection "is at war with our basic concepts of a democratic society and a representative government." *Smith v. Texas*, 311 U.S. 128, 130 (1940).

¶ 40        Accordingly, our courts have long sought to protect the sanctity of juries from the stain of racism. In 1880, the U.S. Supreme Court held that state laws limiting jury service to white men violate the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution. *Strauder*, 100 U.S. at 310. Even after *Strauder*, though, "critical problems persisted." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2239 (2019). Specifically, "[e]ven though laws barring blacks from serving on juries were unconstitutional after *Strauder*, many jurisdictions [still] employed various discriminatory tools to [exclude] black persons from . . . jury service." *Id.*

¶ 41        Peremptory strikes were one such tool. *See id.* ("And when [other] tactics failed, or were invalidated, prosecutors could still exercise peremptory strikes in individual cases to remove most or all black prospective jurors."). "Peremptory strikes have very old credentials . . . traced back to the common law[,]" and "traditionally may be used to remove any potential juror for any reason—no questions asked." *Id.* at 2238. With

this unquestioned discretion, though, also comes the potential for veiled discrimination. *See Miller-El*, 545 U.S. at 238 (noting "the practical difficulty of ferreting out discrimination in selections [that are] discretionary by nature"). Indeed, "[i]n the century after *Strauder*, the freedom to exercise peremptory strikes for any reason meant that the problem of racial exclusion from jury service remained widespread and deeply entrenched[,]" putting the practice squarely in conflict with well-established principles of equal protection. *Flowers*, 139 S. Ct. at 2239 (cleaned up).

¶ 42        In *Batson v. Kentucky*, the U.S. Supreme Court resolved this conflict in favor of equal protection. 476 U.S. at 89 (holding that "the State's privilege to strike individual jurors through peremptory challenges[] is subject to the commands of the Equal Protection Clause"). Specifically, the Court held that "[a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." *Id.* (cleaned up). And contrary to a previous ruling suggesting that proof of repeated strikes of Black prospective jurors over a number of cases was necessary to establish an equal protection violation, the *Batson* Court held that "a defendant may [show] purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection *in his case*." *Id.* at

95; *cf. Swain v. Alabama*, 380 U.S. 202, 227 (1965) (establishing the systematic discrimination requirement overruled in *Batson*).

¶ 43        The *Batson* Court further established a three-step process by which courts analyze claims of racially motivated peremptory strikes, now called "*Batson* challenges." First, a defendant bringing a *Batson* challenge must "make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93–94. "In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances." *Id.* at 96.

¶ 44        Second, "[o]nce the defendant makes a prima facie showing, the burden shifts to the State to come forward with a [race-]neutral explanation for challenging [the] jurors." *Id.* at 97. Although there may be "any number of bases on which a prosecutor reasonably may believe that it is desirable to strike a juror who is not excusable for cause[,]. . . the prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges." *Id.* at 98, n.20 (cleaned up).

¶ 45        Third, in light of both parties' submissions, "[t]he trial court then [must] determine if the defendant has established purposeful discrimination." *Id.* at 98. At this step, the judge must assess "whether the prosecutor's proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the basis of race." *Flowers*, 139 S. Ct. at 2244.

¶ 46      In the years since *Batson*, the U.S. Supreme Court has further clarified each step of this framework. Several of these clarifications are pertinent to our analysis here. Generally, "[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder*, 552 U.S. at 478. Next, regarding a step one, defendants may "present a variety of evidence to support a claim that a prosecutor's peremptory strikes were made on the basis of race[,]" including:

> statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case; evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case; side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case; a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing; relevant history of the State's peremptory strikes in past cases; or other relevant circumstances that bear upon the issue of racial discrimination.

*Flowers*, 139 S. Ct. at 2243 (cleaned up).

¶ 47      Regarding step two, the U.S. Supreme Court has noted that a prosecutor's proffered reasoning need not be "persuasive, or even plausible. At this second step of the inquiry, the issue is only the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (cleaned up). However, while a prosecutor may raise demeanor-based rationales for a peremptory strike, without "a specific finding [by the trial judge] on the record concerning [the

potential juror's] demeanor," a reviewing court "cannot presume that the trial judge credited the prosecutor's assertion [regarding the potential juror's demeanor]." *Snyder*, 552 U.S. at 479. Likewise, a prosecutor's "shifting explanations" or "misrepresentations of the record" may be considered indications of pretext. *Foster*, 578 U.S. at 512.

¶ 48        Finally, the U.S. Supreme Court has provided useful guidance for both trial courts engaging in *Batson* step three and for appellate courts reviewing *Batson* rulings. First, "in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, [a court may consult] all of the circumstances that bear upon the issue of racial animosity." *Snyder*, 552 U.S. at 478. Notably, *Batson* analysis "does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." *Miller-El*, 545 U.S. at 252. Next, appellate courts reviewing a trial court's *Batson* ruling "need not . . . decide that any one [fact] alone would require reversal. All that [it] need[s] to decide . . . is that all of the relevant facts and circumstances taken together establish that the trial court . . . committed clear error in concluding that the State's peremptory strike of [one] black prospective juror . . . was not motivated in substantial part by discriminatory intent." *Flowers*, 139 S. Ct. at 2251. Finally,

while a trial court's *Batson* determination is granted significant deference upon review, "deference does not by definition preclude relief." *Miller-El*, 545 U.S. at 240.[1]

¶ 49      This Court has likewise provided clarification of its framework for analyzing claims of racial discrimination in jury selection. Principally, this Court has adopted the *Batson* test for review of peremptory challenges under the North Carolina Constitution. *See State v. Fair*, 354 N.C. 131, 140 (2001) ("Our courts have adopted the *Batson* test for review of peremptory challenges under the North Carolina Constitution."); *State v. Taylor*, 362 N.C. 514, 527 (discussing the *Batson* test and noting that "this Court subsequently adopted that same test"); *State v. Waring*, 364 N.C. 443, 474 (2010) ("Our review of race-based . . . discrimination during petit jury selection has been the same under both the Fourteenth Amendment to the United States Constitution and Article 1, Section 26 of the North Carolina Constitution"). Regarding the first step, "a prima facie showing of racial discrimination is not intended to be a high hurdle for defendants to cross. Rather, the showing need only be sufficient to shift the burden to the State to articulate race-neutral reasons for its peremptory challenge." *Hobbs*, 374 at 350 (cleaned up). Regarding the second step,

---

[1] Notably, while the trial court's firsthand ability to assess a prosecutor's demeanor and credibility render this significant appellate deference appropriate, there are also human factors that render an appellate court's removed consideration of a *Batson* challenge useful; namely, while a trial judge may feel understandably or unconsciously hesitant to imply that a prosecutor engaged in racial discrimination while that prosecutor is standing right in front of her, appellate judges enjoy a review of the written record further removed from such immediate interpersonal dynamics.

"[t]he State's explanation must be clear and reasonably specific, but does not have to rise to the level of justifying a challenge for cause. Moreover, unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 352 (internal quotations omitted). Finally, in engaging in our own analysis, this Court seeks to be "sensitive to *Batson*'s requirements" and must align itself with applicable guidance from the U.S. Supreme Court. *Waring*, 364 N.C. at 475.

**B. Case at Bar**

With this history and precedent as our guide, we now consider defendant's present *Batson* challenge. "On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder*, 552 U.S. at 477; *see also Waring*, 364 N.C. at 475 ("The trial court's ruling will be sustained unless it is clearly erroneous."). As noted above, such "clear error" is "deemed to exist when, on the entire evidence[,] the Court is left with the definite and firm conviction that a mistake has been committed." *Bennett*, 374 N.C. at 592 (cleaned up). We are left with such a conviction here, and therefore hold that the trial court's order overruling defendant's *Batson* challenge was clearly erroneous.

### 1. Batson *Step One: Prima Facie Showing*

In the first step of a *Batson* challenge, "a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[.]"

*Snyder*, 552 U.S. at 476; *see Taylor*, 362 N.C. at 527 ("First, the defendant must make a prima facie showing that the state exercised a race-based peremptory challenge"). "[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 545 U.S. at 170; *see State v. Hobbs*, 374 N.C. 345, 350 (2020) (quoting *Johnson* for this proposition). "A prima facie showing of racial discrimination is not intended to be a high hurdle for defendants to cross. Rather, the showing need only be sufficient to shift the burden to the State." *Hobbs*, 374 N.C. at 350 (cleaned up).

¶ 52 In response to this initial challenge, the prosecutor may argue that the defendant has failed to establish prima facie showing of discrimination. "However, once a prosecutor has offered a race-neutral explanation for the peremptory challenge and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Bell*, 359 N.C. at 12 (cleaned up); *see also Hobbs*, 374 N.C. at 354 ("Where the State has provided reasons for its peremptory challenges, thus moving to *Batson*'s second step, and the trial court has ruled on them, completing *Batson*'s third step, the question of whether a defendant initially established a prima facie case of discrimination becomes moot.").

¶ 53 Here, immediately after the prosecutor completed his questioning of potential

jurors, defense counsel raised a *Batson* challenge regarding the prosecutor's peremptory strikes of Ms. Jeffreys and Ms. Aubrey. In support of her challenge, defense counsel noted both the State's disproportionate use of peremptory strikes against Black prospective jurors and the lack of other distinguishing factors between the excluded Black potential jurors and accepted white potential jurors. Specifically, defense counsel stated:

> [S]o far, there have been four challenges by the State and if my numbers are correct, there were two white males and two black females. Ms. Viola Jeffreys who was originally placed in Seat No. 5 and then subsequently Ms. Gwendolyn Aubrey who was placed in Seat No. 5, both women are African-American. They are the only African-Americans seated in the jury box at this point in time.[2] Both have been cut by the State. I'm at a loss as to what it was that caused the State to determine that they should be cut in light of the comparables in the jury pool. The only distinction I see is color. Therefore, we would object to and challenge the State's peremptory challenges made thus far.

The trial court then gave the prosecutor an opportunity to address the *Batson* challenge. Rather than asserting that defendant had not established prima facie showing of discrimination, the prosecutor instead began providing justifications for the challenged peremptory strikes. As the trial court identified in its subsequent response, this moved directly to the second step of the *Batson* analysis:

> All right. This is a three-step process and the first step is for the defense to make a prima facie argument. Mr. Wiggs,

---

[2] Later, when asked to self-identify his race, Juror #12 stated "My dad is black and my mom is Chinese . . . [s]o I'm whatever you call that."

> you moved directly to the second step, which is fine, which
> is that you offered neutral—with what you purport to be
> neutral justification.

Accordingly, step one of defendant's *Batson* challenge was rendered moot, and "we need not examine whether defendant met his initial burden." *Hobbs*, 374 N.C. at 355 (cleaned up). The trial court, therefore, did not err in concluding the same.[3]

### 2. Batson *Step Two: Race-Neutral Reasoning*

¶ 55    Second, "[o]nce the defendant makes prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Batson*, 476 U.S. at 97; *see Fair*, 354 N.C. at 140 ("If this showing is made, the court advances to the second step, where the burden shifts to the state to offer a facially valid, race-neutral rationale for its peremptory challenge"). As noted above, this step "does not demand an explanation that is persuasive, or even plausible[,]" but only one that is facially race-neutral. *Purkett*, 514 U.S. at 768; *see Fair*, 354 N.C. at 140 (stating this same proposition). "As long as the state's reason appears facially valid and betrays no inherent discriminatory intent, the reason is deemed race-neutral." *Fair*, 354 N.C. at 140.

¶ 56    Here, during the initial *Batson* inquiry before trial, the prosecutor contended

---

[3] The Court of Appeals also correctly, if implicitly, held step one of the *Batson* inquiry to be moot when it noted that "the trial court heard the State's reasons for striking Jeffreys and Aubrey prior to making a ruling on defendant's Batson objections," and subsequently moved to step two. *Clegg*, 2017 WL 3863494 at *3.

that he struck both Ms. Jeffreys and Ms. Aubrey for their body language and lack of eye contact. He further asserted that he struck Ms. Jeffreys because of her potential bias toward defendant arising from her previous employment at Dorothea Dix Hospital, and that he struck Ms. Aubrey because she answered "I suppose" to a question asking whether she could be fair and impartial. The trial court subsequently found that these reasons "constitute neutral justifications for exercising peremptory challenges" in satisfaction of *Batson* step two.

Later, at the *Batson* rehearing, the prosecutor offered slightly different reasons for his peremptory strikes of Ms. Jeffreys and Ms. Aubrey. Regarding Ms. Jeffreys, the prosecutor again asserted that the peremptory strike "was based primarily on her stated occupation as being retired from Dorothea Dix Hospital, with the understanding that she was a nurse to mental health patients who were suffering from mental health diseases." Because defendant's "mental health was an underlying issue and concern for the defense," the prosecutor contended, "it was the State's belief [that Ms. Jeffreys] would possibly be sympathetic to the defendant despite overwhelming evidence of his guilt." The prosecutor did not mention Ms. Jeffreys's body language or lack of eye contact at the rehearing.

Regarding his strike of Ms. Aubrey, the prosecutor proffered two rationales at the rehearing. The first was the same as before trial: "her body language and her lack of eye contact." Second, the prosecutor noted that Ms. Aubrey had replied "I suppose"

to a question regarding whether she felt confident that she could focus on the trial. The prosecutor further noted that when he asked Ms. Aubrey a follow-up question on this issue, she replied "I think so." These short and equivocal answers, combined with "her body language and her lack of eye contact," the prosecutor asserted, created concern about "whether or not [Ms. Aubrey] could be an engaged juror throughout [the trial]."

¶ 59        The prosecutor then addressed the shift in this reasoning between the initial *Batson* inquiry and the rehearing. Noting that he was "completely flustered when this was brought up during trial[,]" the prosecutor conceded that he "missp[oke] with respect to the…question that Ms. Aubrey was answering." He then confirmed that Ms. Aubrey had in fact answered "I suppose" not to a question about being fair and impartial, but about being confident in her ability to focus on the trial, and that he had "confus[ed] those questions and her answer."

¶ 60        In assessing the prosecutor's proffered reasons at the rehearing, the trial court again accepted the justifications as race-neutral in satisfaction of the State's burden of production under *Batson* step two. Regarding the proffered reason for the strike of Ms. Jeffreys, the trial court stated during the rehearing that her previous employment at Dorothea Dix was a "distinguishing race[-]neutral fact" and "an appropriate ground for a peremptory challenge." The court further stated in its written rehearing order that "[a]s to juror Viola Jeffreys, the State offered a race-

neutral reason for exercising the strike."

¶ 61          The trial court likewise found the prosecutor's rehearing reasoning for striking Ms. Aubrey to be race-neutral. Specifically, the court's rehearing order stated that "had the prosecutor, in offering his race-neutral basis for exercising the strike of Ms. Aubrey, stated that he was concerned that she had answered 'I suppose[]' to the question of whether she could focus, . . . that, in the [c]ourt's view, would have constituted a neutral justification for the strike." The court later likewise described the "body language" and "lack of eye contact" justification as another "race-neutral reason articulated by the prosecutor."

¶ 62          We cannot find that the trial court erred in determining that the prosecutor met his burden of production under *Batson* step two. To be clear, as clarified by the U.S. Supreme Court in *Purkett*, the inquiry here is limited only to whether the prosecutor offered reasons that are race-neutral, not whether those reasons withstand any further scrutiny; that scrutiny is reserved for step three. *See* 514 U.S. at 767–68; *Johnson*, 545 U.S. at 171 ("Thus, even if the State produces only a frivolous or utterly nonsensical justification for its strike, the case does not end—it merely proceeds to step three."). The prosecutor's proffered reasons here—body language and lack of eye contact, concern of bias, concern of partiality, and concern of lack of focus— are all facially race-neutral. Accordingly, the trial court's findings here and subsequent decision to move to step three of the *Batson* analysis was not erroneous.

### *3.* Batson *Step Three: Determining Discrimination*

¶ 63        Under *Batson*'s third and final step, "[t]he trial court…[has] the duty to determine if the defendant has established purposeful discrimination." 476 U.S. at 98; *see Waring*, 364 N.C. at 475 ("Finally, the trial court must then determine whether the defendant has met the burden of proving purposeful discrimination") (cleaned up). At this stage, the trial judge must consider all of the relevant circumstances and reasoning submitted by both parties to "determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." *Flowers*, 139 S. Ct. at 2241. In conceptualizing this framework as a whole, a common judicial analogy proves illustrative: in step one (and in subsequent rebuttal),[4] the defendant places his reasoning on the scale; in step two (and in subsequent rebuttal),[5] the State places its counter-reasoning on the scale; in step three, the court carefully weighs all of the reasoning from both sides to ultimately "decid[e] whether it was more likely than not that the challenge was improperly motivated." *Johnson*, 545 U.S. at 170; *see Hobbs*, 374 N.C. at 351 (quoting *Johnson* for this proposition). If so, the defendant has established a *Batson* violation.

¶ 64        Here, the trial court's rehearing order carefully described its step three

---

[4] After the prosecutor proffers race-neutral reasoning in step two, "[o]ur courts allow the defendant to submit evidence to show that the state's proffered reason is merely a pretext for discrimination." *Fair*, 354 N.C. at 140. Trial courts may subsequently allow the prosecutor an opportunity for surrebuttal before making their ultimate ruling under step three.

[5] *See* note 4 above.

analysis weighing the reasoning submitted by defendant and the prosecutor. First, the court ruled that the prosecutor's peremptory strike of Ms. Jeffreys (on the basis of concern of potential bias) did not constitute a *Batson* violation. Specifically, the court stated:

> The record reflects that, in prior proceedings in this case, the [d]efendant's competency had been called into question and evaluations ordered. The State's stated basis for striking Ms. Jeffreys due to her work history in the mental health field is rationally related to the defendant's potential competency issues, and thus the [c]ourt finds this reason is supported by the record and constitutes an appropriate justification for the strike.

Because we later conclude that the trial court clearly erred in overruling defendant's *Batson* challenge regarding Ms. Aubrey, and "[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose[,]" we decline to consider whether the trial court's ruling regarding Ms. Jeffreys was also clearly erroneous. *Snyder*, 552 U.S. at 478.

¶ 65    Second, the trial court weighed the reasoning provided by both defendant and the prosecutor regarding the peremptory strike of Ms. Aubrey. After reviewing the transcript from the initial *Batson* inquiry, the trial court stated that "[i]t is evident from the record that both the trial court's and the prosecutor's memory of the answers given by Ms. Aubrey was conflated. She did not say 'I suppose' in response to a question of whether she could be 'fair and impartial.'" Rather, the court went on to observe from the record, she provided that answer in response to the prosecutor's

question about whether she felt confident that she could focus on the trial. The trial

court then stated the following:

> 8. In retrospect, had the prosecutor, in offering his race-neutral basis for exercising the strike of Ms. Aubrey, stated that he was concerned that she had answered "I suppose" to the question of whether she could focus, when coupled with her concern that she worked 'day and night' and would miss work, that, in the [c]ourt's view, would have constituted a neutral justification for the strike.

> 9. However, as it stands, the State's offered reason for striking Ms. Aubrey based on her "I suppose" answer is not supported by the record because the prosecutor associated that answer with whether she could be "fair and impartial," not whether she could focus.

¶ 66        The trial court then observed that under the U.S. Supreme Court's ruling in

*Foster*, "when reasons that are offered by a prosecutor as a basis for exercising a strike

contradict or mischaracterize the record, those reasons must be rejected in evaluating

whether race was a motivating factor in exercising the strike," citing *Foster*, 578 U.S.

at 505, 510. "Moreover," the court continued, "a trial court is not permitted to consider

race-neutral reasons for exercising a strike that are not articulated by the

prosecutor," citing *Miller-El*, 545 U.S. at 250–52. Accordingly, the trial court ruled

that "[s]trict application of the rules articulated in *Foster* and *Miller-El* to the race-

neutral (but mis-remembered) reasons provided by the prosecutor justifying Ms.

Aubrey's strike . . . require the [c]ourt to exclude and not consider the reason

articulated by the prosecutor – that Ms. Aubrey said that 'she supposed' she could be

fair and impartial – because that reason is contradicted by the record."

¶ 67    Having thus rejected the prosecutor's "I suppose" rationale, the trial court then moved on to consider what it noted was "the only [remaining] race-neutral reason articulated by the prosecutor[:] . . . the 'body language' and 'lack of eye contact' rationale." However, the trial court found that this reasoning, too, was invalid. Specifically, the court noted that "[t]he 'body language' rationale was disputed by trial counsel for the [d]efendant, and the trial court made no specific findings regarding Ms. Aubrey's body language or demeanor." Under the U.S. Supreme Court's ruling in *Snyder*, the trial court stated, "the 'body-language' race-neutral justification offered by the prosecutor cannot be viewed as sufficient" in the absence of any corroborating findings of fact by the trial court. "As such," the trial court ruled, "both race-neutral justifications offered by the prosecutor fail – one because the prosecutor mis-remembered the question to which Ms. Aubrey responded 'I suppose,' and the other because the trial court failed to make sufficient findings of fact to establish a record of Ms. Aubrey's body language." In other words, the prosecution had placed two reasons on the scale, and the trial court deemed them both weightless.

¶ 68    The trial court then considered the evidence proffered by defendant tending to show racial discrimination. Specifically, the court weighed defendant's statistical evidence "both relating to the trial at issue and [to] North Carolina at large." With respect to this trial, that evidence identified that of the twenty-two members of the

jury pool, three were people of color. Further, of the prosecutor's four peremptory strikes, two were used strike two of those three potential jurors of color, "which also turned out to be all the" women of color. Proportionally, then, the State struck about ten percent of the eligible white jurors and about sixty-six percent of the eligible jurors of color, resulting in a jury of eleven white members and one member of mixed race. When asked by defense counsel to identify their race, none of the selected jurors self-identified as African American.[6]

¶ 69    The trial court then noted defendant's evidence of racial disparities in the exercise of peremptory strikes across North Carolina. Specifically, the court noted that this evidence indicated "that in noncapital cases studied from 2011–12, prosecutors struck black venire members at about twice the rate of white." (citing Pollitt & Warren, 94 N.C. L. Rev. at 1964).

¶ 70    Finally, the trial court weighed defendant's "side-by-side comparison of questioning of white jurors and African[-]American jurors." Specifically, the court considered defendant's comparison of the prosecutor's questioning of Ms. Aubrey with that of fellow prospective juror Mr. David Williams regarding their ability to focus during trial. The court noted the following exchange from the record:

> Prosecutor: I don't need specifics, but, you know, is there a possibility that your mind could drift somewhere else when we need you to be focusing on the proceedings here?

---

[6] *See* note 2.

Mr. Williams: I have 11 employees out in the field, so –

Prosecutor: Okay. Ms. Aubrey, do you feel confident you can focus on what's going on here?

Ms. Aubrey: I suppose.

Prosecutor: I want you to be confident about it. You just don't want to be a juror or do you feel like if you were here, you could focus and do what we need you to do?

Ms. Aubrey: I think so.

Upon review, though, the trial court did not find this comparison "particularly pertinent because Mr. Williams had previously stated that, with respect to his supervisory duties, 'I can juggle things around[,]' whereas Ms. Aubrey did not indicate any flexibility in her 'day and night' work schedule that might ease her concern about missing work."

The trial court then moved to its final determination regarding defendant's *Batson* challenge. "Here," the court ruled, "[d]efendant has shown that the race-neutral justifications offered by the prosecutor cannot be supported by the record – either because the prosecutor mis-remembered the potential juror's answer or because the trial court failed to make an adequate record of the body language of the prospective juror." "The [d]efendant has also shown," the court continued, "evidence of statistical disparities in the exercise of peremptory challenges by prosecutors in statewide jury selection studies in data collected from 1990 to 2012." Reaching its ultimate conclusion, though, the court stated:

> However, the [c]ourt cannot conclude from this record that in this case, the State has engaged in "purposeful discrimination." As the [d]efendant points out, the applicable standard is, given all relevant circumstances, "whether it was more likely than not that the challenge was improperly motivated." *Johnson v. California*, 545 U.S. 162, 170 (2005). Even on this relaxed "more likely than not" standard, this [c]ourt concludes that essential evidence of purposeful discrimination—which is the defendant's burden to prove—is lacking.

¶ 73 To support this conclusion, the trial court reasoned that "[t]he cases in which the [U.S.] Supreme Court has found that the state exercised peremptory challenges in a purposefully discriminatory fashion are strikingly different from the case at hand." As examples, the court discussed *Foster* and *Miller-El*, in which the prosecutors had exhibited "smoking-gun" evidence of racial discrimination such as, respectively, highlighting the names of all Black potential jurors on their juror list and asking Black potential jurors a "trick question" not asked of white potential jurors. *See Foster*, 578 U.S. at 493–95; *Miller-El*, 545 U.S. at 255. The trial court reasoned that because this case was "markedly distinguishable" from those cases and involved "an instance of a prosecutor mis-remembering" rather than a "'mischaracterization' of the record[,]" "the quantum of evidence in this case . . . is insufficient to support the conclusion that the prosecutor engaged in purposeful discrimination."

¶ 74 Our review of the trial court's *Batson* step three analysis reveals several errors that collectively leave this Court "with the definite and firm conviction that a mistake

has been committed[,]" thus rendering the trial court's determination clearly erroneous. *Bennett*, 374 N.C. at 592. As noted above, "[w]e need not and do not decide that any one of those [errors] alone would require reversal. All that we need to decide, and all that we do decide, is that all of the relevant facts and circumstances taken together establish that the trial court committed clear error in concluding that the State's peremptory strike of [a] black prospective juror . . . was not 'motivated in substantial part by discriminatory intent.' " *Flowers*, 139 S. Ct. at 2235 (quoting *Foster*, 578 U.S. at 512). Before discussing the trial court's errors, though, it is first worth noting several points of analysis on which the trial court was correct.

¶ 75 First, the trial court acted properly in rejecting the prosecutor's proffered "I suppose" reasoning. As the U.S. Supreme Court illustrated in *Foster*, proffered reasons that are contradicted by the record are unacceptable in supporting a challenged peremptory strike. *See* 578 U.S. at 505. ("Moreover, several of Lanier's reasons…are similarly contradicted by the record"). Likewise, shifting explanations indicate pretext and should be viewed with suspicion. *See id.* at 507 ("As an initial matter, the prosecutor's principal reasons for the strike shifted over time, suggesting that those reasons may be pretextual.").

¶ 76 Here, the prosecutor's "fair and impartial" reasoning during the initial *Batson* inquiry was contradicted by the record, and his "focus" reasoning during the rehearing amounted to a shifting explanation. Whether the initial misstatement was

the product of accidental "misremembering," as the trial court found, or intentional "mischaracterizing" does not change the fact that the proffered reason was plainly unsupported by the record. Accordingly, the trial court properly rejected this rationale.[7] To the extent that the trial court viewed this misstatement "in the light most favorable to the prosecutor," as it offhandedly remarked during the rehearing, though, that would reflect a fundamental misunderstanding of the *Batson* framework and constitute error. However, because the trial court articulated the correct burden of proof in its written order, we do not consider this remark further.

¶ 77    Second and similarly, the trial court properly rejected the prosecutor's "body language and lack of eye contact" reasoning. As the U.S. Supreme Court indicated in *Snyder*, while demeanor-based reasoning can be rightly credited "where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike[,]" without such corroboration "we cannot presume that the trial judge credited the prosecutor's assertion" regarding the potential juror's demeanor. 552 U.S. at 479. Here, not only did the trial judge not corroborate the prosecutor's assertion regarding Ms. Aubrey's body language and eye contact, defense counsel specifically refuted it.

---

[7] While the dissent claims that "the trial court may have taken the holding in *Miller-El* too literally" in rejecting the State's proffered reasoning here (¶ 26), we understand the trial court to have simply concluded that the U.S. Supreme Court meant what it said when it held that "[i]f the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." *Miller-El*, 545 U.S. at 252. Notably, the Court of Appeals made this same misstep when it provided its own "clarification" to the State's actual proffered reason. *See Clegg*, WL 3863494 at *4.

Because the trial court made no specific findings of fact regarding Ms. Aubrey's body language, it properly rejected this reasoning at the rehearing.

¶ 78        What's more, the prosecutor's demeanor-based reasoning here was even less specific—and therefore less credible—than that rejected in *Snyder*. In *Snyder*, the prosecutor claimed that the rejected juror was "nervous," a description that at least minimally invokes a commonly understood set of more specific behaviors. *Id*. Here, the prosecutor merely stated that he struck Ms. Aubrey due to her "body language" without ever specifying anything in particular that might have been concerning about her body language. Further, during the initial pre-trial *Batson* inquiry, the prosecutor never distinguished between Ms. Jeffreys and Ms. Aubrey when discussing body language—he only referred to the two Black women collectively, twice referring to "*their* body language" without any further specification. This complete lack of specificity significantly undermines the credibility of the prosecutor's reasoning.

¶ 79        Historical context provides even more reason for courts engaging in a *Batson* analysis to view generalized "body language and lack of eye contact" justifications with significant suspicion. For example, as recently as 1995, prosecutorial training sessions conducted by the North Carolina Conference of District Attorneys included a "cheat sheet" titled "*Batson* Justifications: Articulating Juror Negatives." *See* Pollitt & Warren, 94 N.C. L. REV. at 1980 (noting a North Carolina trial court's summary of this document in a 2012 Order on a defendant's motion for appropriate relief). This

document provided prosecutors with a list of facially race-neutral reasons that they might proffer in response to *Batson* objections. *See id.*; *see also* Jacob Biba, *Race Neutral*, THE INTERCEPT, Nov. 8, 2021, https://theintercept.com/2021/11/08/north-carolina-jury-racial-discrimination/ (describing the prosecutorial training and *Batson* Justification worksheet); Tonya Maxwell, *Black juror's dismissal, death penalty, revisited in double homicide*, THE ASHEVILLE CITIZEN-TIMES, Nov. 3, 2016, https://www.citizen-times.com/story/news/local/2016/11/03/black-jurors-dismissal-death-penalty-revisited-double-homicide/93168824/ (same). The list included both "body language" and "lack of eye contact," in addition to "attitude," "air of defiance," and "monosyllabic" responses to questions.[8]

¶ 80         Of course, North Carolina is not unique here. When placed within our well-established national history of prosecutors employing peremptory challenges as tools of covert racial discrimination, this historical context cautions courts against accepting overly broad demeanor-based justifications without further inquiry or corroboration. *See Flowers*, 139 S. Ct. at 2239–40 ("And when [other discriminatory] tactics failed, or were invalidated, prosecutors could still exercise peremptory strikes in individual cases to remove most or all black prospective jurors."). Accordingly, the trial court properly rejected the prosecutor's unconfirmed and generalized "body

---

[8] Here, in justifying his peremptory strike of Ms. Aubrey, the prosecutor repeatedly noted that her answers were "short."

language and lack of eye contact" rationale below.

¶ 81        Third and finally, the trial court acted properly in considering defendant's statistical evidence regarding the disproportionate use of peremptory strikes against Black potential jurors in both this case and statewide. As recently identified by the U.S. Supreme Court in *Flowers*, such data is included among the many types of evidence that a defendant may present, and a court may consider, within a *Batson* challenge. 139 S. Ct. at 2243 (listing examples of the variety of evidence defendants may present in Batson challenges).

¶ 82        Despite the areas in which the trial court acted properly, though, several other areas of its *Batson* step three analysis were erroneous. Like the U.S. Supreme Court in *Flowers*, we do not identify any one of the trial court's mistakes as independently requiring reversal. Rather, we determine that "all of the relevant facts and circumstances taken together establish that the trial court committed clear error in concluding that the State's peremptory strike of [Ms. Aubrey] was not motivated in substantial part by discriminatory intent." *Flowers*, 139 S. Ct. at 2251. Specifically, we note four interrelated errors: (1) overruling defendant's *Batson* challenge after rejecting all of the race-neutral reasons provided by the prosecutor; (2) applying an improperly high burden of proof; (3) independently considering reasoning not offered by the prosecutor; and (4) giving inadequate consideration to racially disparate questioning and acceptance of comparable jurors.

¶ 83        First, the trial court erred by ruling that defendant had not met his *Batson* burden after determining that "both race-neutral justifications offered by the prosecutor fail." Under the *Batson* framework, after the defendant and the State have offered their reasoning, the trial court must determine, in light of these submissions, "whether it was more likely than not that the [peremptory] challenge was improperly motivated." *Johnson*, 545 U.S. at 170. If the trial court finds that all of the prosecutor's proffered race-neutral justifications are invalid, it is functionally identical to the prosecutor offering no race-neutral justifications at all. In such circumstances, the only remaining submissions to be weighed—those made by the defendant—tend to indicate that the prosecutor's peremptory strike was "motivated in substantial part by discriminatory intent." *Flowers*, 139 S. Ct. at 2251. As a consequence, then, a *Batson* violation has been established.

¶ 84        Here, after careful analysis, the trial court explicitly ruled that "both race-neutral justifications by the prosecutor fail." At that point, the only valid reasoning remaining for the court to consider was evidence presented by defendant tending to show that the peremptory challenge of Ms. Aubrey was motivated in substantial part by discriminatory intent: disparate data, disparate questioning, and disparate acceptance of substantially comparable jurors. Accordingly, after finding that both race-neutral justifications for the prosecutor's peremptory strike of Ms. Aubrey failed, the trial court should have ruled on this record that defendant met his burden under

*Batson*. Ruling otherwise was erroneous.

Second, the trial court erred by holding defendant to an improperly high burden of proof. Under *Batson*, defendants must "establish purposeful discrimination." 476 U.S. at 98. The U.S. Supreme Court has described this requirement as showing that a peremptory strike was "motivated in substantial part by discriminatory intent[,]" *Flowers*, 139 S. Ct. at 2251, or "whether it was more likely than not that the challenge was improperly motivated." *Johnson*, 545 U.S. at 170.

Here, while the trial court properly *recited* this burden, it failed to apply it with fidelity. Instead, it looked for smoking-gun evidence of racial discrimination similar to what has been present in previous U.S. Supreme Court cases that have found *Batson* violations, namely *Foster*, 578 U.S. 488, and *Miller-El*, 545 U.S. 231. After noting the glaring evidence of discrimination present in those cases, the trial court found that "[t]his case is markedly distinguishable from the facts of this controlling authority."

While that may be true, it is not the *facts* of those decisions that make them controlling authority—it's the *law*. Highlighted names and trick questions are not required for a defendant to show that a peremptory was "motivated in substantial part by discriminatory intent."[9] *Flowers*, 139 S. Ct. at 2251. Rather, as defendant did

_____

[9] Notably, the jury selections at question in both *Foster* and *Miller-El* took place in the late 1980s, either before or immediately after *Batson* was first decided. *See* 578 U.S. at 492 (summarizing the initial crime and trial process); 545 U.S. at 235–236 (same). Given the

here, a defendant may present a wide variety of direct and circumstantial evidence in supporting a *Batson* challenge. *See id.* at 2243 (listing examples of acceptable evidence); *Hobbs*, 374 N.C. at 356 (same). By implicitly holding defendant to an improperly high burden, the trial court erred in its *Batson* step three analysis.

¶ 88     Third, the trial court erred by considering within its *Batson* step three analysis reasoning not presented by the prosecution on its own accord. In *Miller-El*, the U.S. Supreme Court held that "[a] *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." 545 U.S. at 252. Indeed, the trial court here noted as much both during the rehearing and in its subsequent order. During the rehearing, for instance, the trial court stated:

> [T]he [c]ourt cannot interpose [a] valid basis for the exercise of [a] peremptory challenge when the State fails to raise it . . . I would find that had the State said ["Ms. Aubrey] works day and night . . . and she's sitting there slouching in her chair,["] . . . it would be one thing. But I don't think I can interpose that objection for the prosecutor in this case and say look, [had they] said that, . . . that would have been the basis of my ruling. So I think I'm stuck with what they said.

¶ 89     In its subsequent order, though, the trial court did not "st[i]ck with what they

___

historical context noted above, it is unsurprising that *Batson* cases arising from trials in the late twentieth century may reveal more blatant evidence of racial discrimination in jury selection than those arising from trials today.

said." For instance, when considering the prosecutor's questioning of Ms. Aubrey and Mr. Williams, the court ruled that the comparison was "not . . . particularly pertinent because Mr. Williams had previously stated that, with respect to his supervisory duties, 'I can juggle things around[,]' . . . whereas Ms. Aubrey did not indicate any flexibility in her 'day and night' work schedule that might ease her concern about missing work." But the prosecution had never advanced this "day and night" argument on its own accord—not at the initial *Batson* inquiry, and not the subsequent rehearing. While the prosecution certainly *could* have argued that Ms. Aubrey's "day and night" work schedule might impact her ability to focus during trial, it did not. Accordingly, the trial court erred by considering this reasoning within its step three analysis.

¶ 90        Fourth and finally, the trial court erred by failing to adequately consider the disparate questioning and disparate acceptance of comparable white and Black prospective jurors. *See Flowers*, 139 S. Ct. at 2246 ("We next consider the State's dramatically disparate questioning of black and white prospective jurors in the jury selection process."). As typical during jury selection, the prosecutor in this case collectively asked all of the then-seated jurors whether they felt confident that they could focus during the trial. Specifically, the prosecutor asked:

> [D]o you all feel like you can, if you serve as a juror, . . . pay attention to the testimony and the evidence while you're in the courtroom [and] focus exclusively on what's going on in the courtroom? I know we all have distractions in our lives,

> but is there anything that's such a major distraction that
> your mind may be somewhere else when you should be
> focusing on what's going on? I'm not asking you to tell me
> exactly what it is, but anybody have any kind of issues like
> that going on?

Notably, in response to an earlier question from the trial court about "anything going on in [their lives] that would make it difficult or impossible for [them] to serve," several of the jurors had indicated that they had potential work- or family-related logistical challenges, such as having to find coverage at work (Juror #6) or having one or more young children at home (Jurors # 9 and # 12), among others. Nevertheless, when none of the then-seated jurors responded to the prosecutor's question about focus, the prosecutor took them at their word and immediately moved on to another topic without further questioning.

¶ 91     Later, the prosecutor used peremptory strikes to remove three of the initial jurors (including Ms. Jeffreys), leading to the seating of three replacement jurors, including Ms. Aubrey and Mr. David Williams. Like the initial batch of jurors, the trial court asked the three replacements whether they had anything going on in their lives that would make it difficult or impossible for them to serve. Ms. Aubrey responded: "[o]ther than missing work, no[,]" before clarifying in response to a follow-up question by the court that she worked both "[d]ay and night." Mr. Williams responded: "I'm an irrigation contractor and this is our season, and I'm one of the service techs. But I can juggle things around." Later, the prosecutor asked the three

replacement jurors the same question he had previously posed to the initial batch:

> Is there anything going on in your personal life . . . that would maybe take you away mentally from being engaged in what's going on here in the courtroom? Again, I don't need to know specifics, but, you know, is there a possibility that your mind could drift somewhere else when we need you to be focusing on the proceedings here?

In response, like all of the initial jurors previously, Ms. Aubrey remained silent. Then, Mr. Williams spoke up, and the following exchange took place:

> [Mr. Williams]: I have 11 employees out in the field, so —
>
> Mr. Wiggs: Okay. Ms. Aubrey, do you feel confident that you can focus on what's going on here?
>
> [Ms. Aubrey]: I suppose.
>
> Mr. Wiggs: I want you to be confident about it. You just don't want to be a juror or do you feel like if you were here, you could focus and do what we need you to do?
>
> [Ms. Aubrey]: I think so.
>
> Mr. Wiggs: Okay. Thank you.

Later, without asking any further questions to either Ms. Aubrey or Mr. Williams, the prosecutor used a peremptory strike to remove Ms. Aubrey from the jury pool, but did not remove Mr. Williams.

¶ 92    On review, this exchange stands out for two reasons: first for what the prosecutor *did* do, and second for what he did *not* do. First, out of the fifteen potential jurors that the prosecutor had asked about their ability to focus up to this point

(twelve initial and three replacements), Ms. Aubrey was the only one the prosecutor singled out for further specific questioning. And while Ms. Aubrey was the only potential juror who noted that she worked both "day and night," she was far from the only one who had substantially similar work- or family-related logistical challenges that might impact her ability to focus. Accordingly, Ms. Aubrey's "day and night" comment alone cannot bear the weight of justifying this disparate questioning. Indeed, "[a] *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters." *Miller-El*, 545 U.S. at 247, n.6. In any event, as noted above, if the prosecutor was concerned about Ms. Aubrey working day and night, he never stated as much.

¶ 93          Second, this exchange stands out because of what the prosecutor did *not* do: follow up with Mr. Williams. After the prosecutor asked the question about focus, Mr. Williams, unique among the fifteen jurors up to this point, volunteered information that could most reasonably be understood as indicating that he had a professional obligation that might impact his ability to focus during trial: "I have 11 employees out in the field, so —".[10] Indeed, Mr. Williams had previously noted that he was self-

---

[10] The State has suggested that it is possible that, instead of indicating why he might *not* be able to focus during trial, Mr. Williams' comment may have been providing a reason why he *could* focus during trial: because he "ha[d] 11 employees out in the field" who might be able to cover for him in his absence. While this explanation is not completely without merit, given the full context of the record (including the fact that none of the other fourteen

employed and that "this is our season[.]" Instead of following up with Mr. Williams about this comment, though, the prosecutor instead, without explanation, turned immediately to Ms. Aubrey: "Okay. Ms. Aubrey, do you feel confident you can focus on what's going on here?" Ms. Aubrey then replied "I suppose[,]" and later, "I think so[,]" responses that are perfectly normal in jury selection and perhaps even more honest and conversational than a flat "yes." Indeed, if Ms. Aubrey *had* answered with a flat "yes," given the historical context noted above, one can realistically imagine a prosecutor seeking to justify a peremptory strike on the grounds that such an answer was too short, cold, or confident.

¶ 94    While "disparate questioning or investigation alone does not constitute a *Batson* violation[,]" it "can . . . , along with other evidence, inform the trial court's evaluation of whether discrimination occurred." *Flowers*, 139 S. Ct. at 2248. When viewed in the context of the full record, this exchange illustrates disparate questioning and exclusion of Ms. Aubrey compared to substantially comparable white potential jurors who were unquestioned and accepted by the prosecutor. Accordingly, the trial court should have fully considered this evidence within the totality of

---

jurors felt compelled go out of their way to provide the prosecutor with a reason to prove why they *could* focus in response to a question asking for potential reasons why they could not) it appears more likely that Mr. Williams was beginning to suggest that he might not be able to focus. In any event, even accepting both potential meanings as reasonable, the most notable aspect of this exchange is that the prosecutor never followed up with Mr. Williams to clarify what exactly his comment was suggesting.

defendant's submissions. Its failure to do so was erroneous.

¶ 95 "To reiterate, we need not and do not decide [whether] any of these four [errors] alone would require reversal." *Id.* at 2251. Rather, we determine that when these errors are considered cumulatively and within the context of the full record of this case, we are "left with the definite and firm conviction that a mistake has been committed." *Bennett*, 374 N.C. at 592. Accordingly, we hold that the trial court's ruling overruling defendant's *Batson* challenge was clearly erroneous.

## III.     Remedy

¶ 96 Having determined that a *Batson* violation indeed occurred, we must now consider a just remedy. Because the finding of a *Batson* violation during jury selection necessitates the reversal of a defendant's subsequent conviction by that jury, *see Batson*, 476 U.S. at 100 (noting that the finding of a violation "require[s] that petitioner's conviction be reversed"); *Flowers*, 139 S. Ct. at 2252 (Alito, J., concurring) (agreeing with the majority opinion "that petitioner's capital conviction cannot stand"), it would ordinarily follow that a defendant would receive a new trial.

¶ 97 Here, however, defendant has already served his entire sentence of active imprisonment from his now-reversed conviction, and has been discharged from all post-release supervision. N.C.G.S. 15A-1335 provides that "[w]hen a conviction or sentence imposed in superior court has been set aside on direct review or collateral attack, the court may not impose a new sentence for the same offense, or for a

different offense based on the same conduct, which is more severe than the prior sentence less the portion of the prior sentence previously served."

## IV. Conclusion

¶ 98        Today, as surely as in 1880 and 1986, racial discrimination in jury selection violates a defendant's constitutional right to equal protection of the law. *See Strauder*, 100 U.S. 303; *Batson*, 476 U.S. 79. Furthermore, it undermines the credibility of our judicial system as a whole, thus tearing at the very fabric of our democratic society. *See Batson*, 476 at 87 ("The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community."). Accordingly, the *Batson* framework establishes a process through which we seek to root out any remaining vestiges of racial discrimination in jury selection through the use of peremptory strikes.

¶ 99        In reality, the finding of a *Batson* violation does not amount to an absolutely certain determination that a peremptory strike was the product of racial discrimination. Rather, the *Batson* process represents our best, if imperfect, attempt at drawing a line in the sand establishing the level of risk of racial discrimination that we deem acceptable or unacceptable.[11] If a prosecutor provides adequate

---

[11] *See People v. Gutierrez*, 2 Cal. 5th 1150, 1182–83 (2017) (Liu, J., concurring) ("In most cases, courts cannot discern a prosecutor's subjective intent with anything approaching certainty. But the issue is not whether the evidence of improper discrimination approaches certainty or even amounts to clear and convincing proof. The ultimate issue is whether it was

legitimate race-neutral explanations for a peremptory strike, we deem that risk acceptably low. If not, we deem it unacceptably high.

¶ 100        Here, that risk was unacceptably high. After the prosecutor struck two Black women from the jury, defendant raised a *Batson* challenge presenting evidence tending to indicate that racial discrimination was a substantial motivating factor. The prosecutor then proffered two race-neutral justifications for each peremptory strike. Upon review of the peremptory strike of Ms. Gwendolyn Aubrey, the trial court found that "both race-neutral reasons offered by the prosecutor fail." At that point, the only valid reasoning remaining for the trial court to consider was defendant's evidence of discrimination. As a consequence, the totality of the evidence presented for the court to consider established that it was sufficiently likely that the strike was motivated in substantial part by discriminatory intent. This constitutes a substantive violation of defendant's constitutional right to equal protection under the Fourteenth Amendment of the United States Constitution, and the trial court clearly erred in ruling to the contrary. Accordingly, the trial court's order overruling defendant's *Batson* objection is reversed, defendant's conviction is vacated, and the case is remanded to the trial court for any further proceedings.

---

more likely than not that the challenge was improperly motivated. This probabilistic standard is not designed to elicit a definitive finding of deceit or racism. Instead, it defines a level of risk that courts cannot tolerate in light of the serious harms that racial discrimination in jury selection causes to the defendant, to the excluded juror, and to public confidence in the fairness of our system of justice.") (cleaned up).

REVERSED AND REMANDED.

Justice EARLS concurring.

I join fully in the majority's opinion. I agree that the prosecutor's use of a peremptory challenge to exclude Ms. Aubrey, an African-American prospective juror, from the jury empaneled to hear this case violated the Equal Protection Clause of the Fourteenth Amendment. Indeed, "[e]qual justice under law requires a criminal trial free of racial discrimination in the jury selection process." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2242 (2019). I also agree that it is proper to reverse the trial court's order overruling Mr. Clegg's *Batson* objection and for his conviction to be vacated. Mr. Clegg has served his sentence and completed post-release supervision. By statute, where a conviction has been set aside "the court may not impose a new sentence for the same offense, or for a different offense based on the same conduct, which is more severe than the prior sentence less the portion of the prior sentence previously served." N.C.G.S. § 15A-1335 (2021). The State's interest in prosecuting and punishing Mr. Clegg for the crimes with which he was charged has already been fully satisfied.

I would further hold that the prosecutor's use of a peremptory challenge to exclude Ms. Jeffreys, another African-American woman, also violated the Fourteenth Amendment under *Batson*. It is important to address this question because the constitutional interest involved here is not simply the Fourteenth Amendment right of the defendant to a trial free from racial discrimination. "The *Batson* decision was grounded in the criminal defendant's right to equal protection of the

laws . . . . *Batson* also concluded, however, that race-based exclusion of jurors violates the equal protection rights of the excluded jurors . . . .” Barbara D. Underwood, *Ending Race Discrimination in Jury Selection: Whose Right Is It, Anyway?,* 92 Colum. L. Rev. 725, 726 (1992) (footnote omitted) (citing *Batson v. Kentucky,* 476 U.S. 79, 85–87 (1986)). The United States Supreme Court recently reaffirmed this understanding, which flows directly from the Court's holding in *Strauder*:

> In the words of the *Strauder* Court: 'The very fact that colored people are singled out and expressly denied by a statute all right to participate in the administration of the law, as jurors, because of their color, though they are citizens, and may be in other respects fully qualified, is practically a brand upon them, affixed by the law, an assertion of their inferiority, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others.' For those reasons, the Court ruled that the West Virginia statute excluding blacks from jury service violated the Fourteenth Amendment.

*Flowers*, 139 S. Ct. at 2239 (cleaned up) (quoting *Strauder v. West Virginia*, 100 U.S. 303, 308 (1879)). On numerous other occasions the United States Supreme Court has made clear that the equal protection rights of excluded jurors are also recognized and can be asserted by third parties. *See, e.g., Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 629–30 (1991) (prospective jurors have an equal protection right to be free of race-based jury selection in civil cases as well as criminal cases); *Powers v. Ohio,* 499 U.S. 400, 425 (1991) (rights of excluded jurors can be invoked by one civil litigant against another, and by a criminal defendant of a different race from that of the

excluded juror).

¶ 103    In *Powers,* the Court explained that while an individual does not have a right to be chosen to sit on any particular jury, they do have a right not to be excluded from jury service because of their race. *Powers*, 499 U.S. at 409.

> It is suggested that no particular stigma or dishonor results if a prosecutor uses the raw fact of skin color to determine the objectivity or qualifications of a juror. We do not believe a victim of the classification would endorse this view; the assumption that no stigma or dishonor attaches contravenes accepted equal protection principles. Race cannot be a proxy for determining juror bias or competence. "A person's race simply 'is unrelated to his fitness as a juror.'"

*Id.* at 410 (quoting *Batson,* 476 U.S. at 87). Thus, "[a] venireperson excluded from jury service because of race suffers a profound personal humiliation heightened by its public character." *Id.* at 413–14. Although not evidence in the record of this case, the following material submitted with an amicus brief in the *Batson* case is illustrative of the harm to prospective jurors:

> In November of 1984, a person summoned for jury service in Brooklyn, New York, wrote a letter to the District Attorney complaining about race discrimination in jury selection. The person wrote that in a murder case against a Hispanic defendant, a majority of the prospective jurors were black, but an all-white jury was chosen, and it appeared to the writer that black jurors were being excluded on the basis of race. The writer asked: 'If we Blacks don't have common sense and don't know how to be fair and impartial, why send these summonses to us? Why are we subject to fines of $ 250.00 if we don't appear and told it's our civic duty if we ask to be excused? Why bother

> to call us down to these courts and then overlook us like a
> bunch of naive or better yet ignorant children? We could be
> on our jobs or in schools trying to help ourselves instead of
> in courthouse halls being made fools of.'

Underwood, *Ending Race Discrimination,* at 745. While it is inevitably a burden, "with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process." *Powers,* 499 U.S. at 407. One of the principal justifications for retaining the jury system is that it provides an opportunity for ordinary citizens "to participate in the administration of justice." *Id.* at 406 (citing *Duncan v. Louisiana,* 391 U.S. 145, 147-58 (1968)). Therefore, to be excluded from that opportunity based on one's race creates a unique kind of irreparable harm. *See also Edmonson,* 500 U.S. at 628 ("If peremptory challenges based on race were permitted, persons could be required by summons to be put at risk of open and public discrimination as a condition of their participation in the justice system. The injury to excluded jurors would be the direct result of governmental delegation and participation.")

¶ 104 Considering this harm, we should examine the parties' arguments and decide whether the prosecutor's decision to use a peremptory challenge to exclude Ms. Jeffreys was an equal protection violation. As the majority explains, on remand the trial court found that the prosecutor had offered a race-neutral reason for excluding Ms. Jeffreys, namely that she was previously employed as a nurse at Dorothea Dix Hospital and therefore may be sympathetic to Mr. Clegg's mental health issues. This

is a race-neutral explanation supported by the record and satisfies the State's burden of production under *Batson's* second step.

¶ 105    In examining whether this explanation is persuasive, under *Batson*'s third step, additional facts are significant to provide context.  The trial court found that Ms. Jeffreys's employment at Dorothea Dix Hospital was "rationally related to the Defendant's potential competency issues." However, Mr. Clegg's competency issues had already been resolved pre-trial, as the court had already determined that he was competent to stand trial and there was no reason to believe that the jury would hear about or have anything to decide about his competency. Significantly, the prosecutor did not ask any other juror if they had experience with mental health or competency issues. *See Miller-El v. Dretke*, 545 U.S. 231, 246 (2005) ("[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination[.]" (first alteration in original) (quoting *Ex parte Travis*, 776 So. 2d 874, 881 (Ala. 2000))).  These facts alone are sufficient to demonstrate that the prosecutor's race-neutral explanation is pretextual.

¶ 106    However, the trial court erred in failing to acknowledge and factor into its analysis statistics cited by Mr. Clegg on remand which showed that prior to his trial in 2016, from 2011 to 2012, Wake County prosecutors struck Black prospective jurors at 1.7 times the rate of white prospective jurors in all jury trials in North Carolina

during that year. This information is relevant to determining whether discrimination has occurred in this particular case. *See State v. Hobbs,* 374 N.C. 345, 359–60 (2020) (trial court erred in failing to weigh historical evidence of racial discrimination in jury selection); *see also Flowers v. Mississippi,* 139 S. Ct. at 2245 ("Most importantly for present purposes, after *Batson*, the trial judge may still consider historical evidence of the State's discriminatory peremptory strikes from past trials in the jurisdiction, just as *Swain* had allowed.)

¶ 107    Considering the very localized and specific statistical evidence of the racially disparate use of peremptory challenges by prosecutors, the statewide data that was acknowledged by the trial court, the lack of any documented reason to exclude Ms. Jeffreys beyond a reason that appears to be pretextual, and the fact that the prosecutor here used two of his four peremptory challenges to strike all of the Black female prospective jurors,[1] it was clearly error for the trial court to conclude that Mr. Clegg failed to carry his burden of demonstrating racial discrimination in the prosecutor's use of a peremptory challenge to exclude Ms. Jeffreys from the jury. *Cf. Snyder v. Louisiana,* 552 U.S. 472, 485, 478 (2008) (a trial court's finding of discrimination against one juror is evidence of discrimination against other jurors).

---

[1] The State exercised four peremptory strikes: Viola Jeffreys, Gwendolyn Aubrey, Joseph Barello, and Brian Williams. The State struck 10%–11% of eligible white jurors (2/19) and 66% of eligible non-white jurors (2/3). All the women of color called to serve were stricken by the State.

¶ 108        The State also asserted that it excluded Ms. Jeffreys, as it did Ms. Aubrey, because of her "body language and failure to make eye contact" without further elaboration of what about Ms. Jeffreys' body language explained the decision to exclude her from the jury. The trial court concluded that this justification could not be supported by the record because there was not "an adequate record of the body language of the prospective juror."

¶ 109        In addition to the inadequate record, I would follow other courts that have found such explanations insufficient to constitute a valid, race-neutral explanation. *See, e.g., State v. Giles,* 407 S.C. 14, 20–22 (2014) (explanation provided by proponent of a peremptory challenge at second step of *Batson* process must be clear and reasonably specific to be legally sufficient); *Zakour v. UT Med. Grp., Inc.*, 215 S.W.3d 763, 775 (Tenn. 2007) (finding explanation that six prospective female jurors were stricken because of their body language, without providing more detail, was not clear, reasonably specific, legitimate and reasonably related to the particular case being tried); *Spencer v. State*, 238 So. 3d 708, 712 (Fla. 2018) (under Florida law, second step of *Batson* requires prosecutor to identify "clear and reasonably specific" race-neutral explanation that is related to case being tried (quoting *State v. Slappy*, 522 So.2d 18, 22 (Fla. 1988))), *cert. denied,* 138 S. Ct. 2637. I would therefore hold that that a general reference to a person's body language without more and particularly without documentation of such facts on the record, is not a valid race-neutral

explanation of a peremptory challenge that satisfies the second step of *Batson* even under the standard set by the United States Supreme Court in its decision in *Purkett v. Elem*, 514 U.S. 765 (1995).

¶ 110 The *Purkett* Court took a very broad approach to the second step, suggesting that virtually any race-neutral explanation, if "plausible," is satisfactory. *Purkett*, 514 U.S. at 768. However, the Court has also explained that 'seat-of-the-pants instincts' may often be just another term for racial prejudice." *Batson,* 476 U.S. at 106 (Marshall, J., concurring). The Washington Supreme Court has specifically identified "body language" and "failing to make eye contact" as reasons for a peremptory challenge that historically have been "associated with improper discrimination in jury selection" and required that if any party intends to offer such a reason for a peremptory challenge, notice must be provided to the court and the other parties "so the behavior can be verified and addressed in a timely manner." Wash. Gen. R. 37(i). Moreover, "[a] lack of corroboration by the judge or opposing counsel verifying the behavior shall invalidate the given reason for the peremptory challenge." *Id.* Therefore, I agree with the Louisiana Supreme Court and others that have held that a general explanation, such as body language cannot be a satisfactory race-neutral explanation because "[s]uch an all inclusive reason falls far short of an articulable reason that enables the trial judge to assess the plausibility of the proffered reason for striking a potential juror." *Alex v. Rayne Concrete Serv.,* 2005-1457 (La. 1/26/07);

951 So. 2d 138, 153. Indeed, "[i]f trial courts were required to find any reason given not based on race satisfactory, only those who admitted point-blank that they excluded veniremen because of their race would be found in violation of the Fourteenth Amendment's guarantee of equal protection." *Id.* at 154 (quoting *State v. Collier,* 553 So. 2d 815, 821 (La. 1989)).

¶ 111        More generally, guaranteeing that juries are selected without racial bias is important to the administration of justice not only for the rights of the litigants and the rights of prospective jurors, but also for the legitimacy of the court system itself. *Taylor v. Louisiana,* 419 U.S. 522, 530–31 (1975) (fair representation of juries is essential to (1) guard against the exercise of "arbitrary power" and by invoking the "commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor," (2) uphold "public confidence in the fairness of the criminal justice system," and (3) share the administration of justice which "is a phase of civic responsibility").

¶ 112        When racial bias infects jury selection, it is an affront to individual dignity and removes important voices from the justice system. Writing nearly one hundred years ago, Chief Justice Taft explained:

> The jury system postulates a conscious duty of participation in the machinery of justice . . . . One of its greatest benefits is in the security it gives the people that they, as jurors actual or possible, being part of the judicial system of the country can prevent its arbitrary use or abuse.

*Balzac v. Porto Rico*, 258 U.S. 298, 310 (1922). More recently, when expanding *Batson* to the civil context, Justice Kennedy explained why eliminating racial bias in courtroom is fundamental:

> Few places are a more real expression of the constitutional authority of the government than a courtroom, where the law itself unfolds. Within the courtroom, the government invokes its laws to determine the rights of those who stand before it. In full view of the public, litigants press their cases, witnesses give testimony, juries render verdicts, and judges act with the utmost care to ensure that justice is done.
>
> Race discrimination within the courtroom raises serious questions as to the fairness of the proceedings conducted there. Racial bias mars the integrity of the judicial system and prevents the idea of democratic government from becoming a reality.

*Edmonson*, 500 U.S. at 628. Just four years ago, in overturning a conviction rendered by a jury that was found to have based its decision explicitly on the defendant's race, the Court again explained the significance of the jury in our legal system and our democracy:

> The jury is a central foundation of our justice system and our democracy. Whatever its imperfections in a particular case, the jury is a necessary check on governmental power. The jury, over the centuries, has been an inspired, trusted, and effective instrument for resolving factual disputes and determining ultimate questions of guilt or innocence in criminal cases. Over the long course its judgments find acceptance in the community, an acceptance essential to respect for the rule of law. The jury is a tangible implementation of the principle that the law

comes from the people.

*Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 860 (2017). Given the importance of fair jury selection processes, it is incumbent on this Court to take reasonable steps to address the obstacles we face. We must acknowledge that this Court's *Batson* jurisprudence has not been effective. This case is the first case where we have reversed a conviction on *Batson* grounds. The record is clear:

> Since 1986, and as of September 6, 2016, the Supreme Court of North Carolina has decided seventy-four cases on the merits in which it adjudicated eighty-one *Batson* claims raised by criminal defendants over alleged racial discrimination against minority jurors in the State's exercise of peremptory challenges at criminal trials. To date, that [C]ourt has not found a substantive *Batson* violation in any of those cases. In seventy-one of those seventy-four cases, that [C]ourt found no *Batson* error whatsoever. In the three remaining cases, that [C]ourt held the trial court erred at *Batson*'s first step in finding no prima facie case existed and conducted or ordered further review. However, none of these three cases has ultimately resulted in the holding of a substantive *Batson* violation.

Daniel R. Pollitt & Brittany P. Warren, *Thirty Years of Disappointment: North Carolina's Remarkable Appellate Batson Record,* 94 N.C. L. Rev. 1957, 1961 (2016) (footnotes omitted). Faced with a similarly stark record, the Washington Supreme Court observed in 2013 that its experience was "rather shocking and underscores the substantial discretion that is afforded to trial courts under *Batson*. And while this alone does not prove that *Batson* is failing, it is highly suggestive in light of all the other evidence that race discrimination persists in the exercise of peremptories."

*State v. Saintcalle,* 178 Wash. 2d 34, 46, 309 P.3d 326, 335, *cert. denied,* 571 U.S. 1113 (2013), *and overruled in part on other grounds by Seattle v. Erickson,* 188 Wash. 2d 721, 398 P.3d 1124 (2017); *see also Miller-El,* 545 U.S. at 268–70 (Breyer, J., concurring) (reviewing the body of evidence showing that *Batson* has done very little to prevent prosecutors from exercising race-based challenges).

Justice Marshall predicted that "[m]erely allowing defendants the opportunity to challenge the racially discriminatory use of peremptory challenges in individual cases will not end the illegitimate use of the peremptory challenge." *Batson*, 476 U.S. at 105 (Marshall, J., concurring). In brief, and perhaps stating the obvious, the *Batson* framework makes it very difficult for litigants to prove intentional discrimination, "even where it almost certainly exists." *Erickson*, 188 Wash. 2d at 735–36, 398 P.3d at 1131–32 (quoting *Saintcalle,* 178 Wash. 2d at 46, 309 P.3d at 335). *Batson* also completely fails to address peremptory strikes that occur due to implicit or unconscious bias,[2] as Marshall pointed out when referencing prosecutors' and judges' "conscious or unconscious" bias. *Batson*, 476 U.S. at 106 (Marshall, J., concurring). Other natural human inclinations also make it difficult for counsel to assert that a member of the bar is acting out of purposeful discrimination[3] and judges

---

[2] *See, e.g.,* Samuel R. Sommers & Michael I. Norton, *Race-Based Judgments, Race-Neutral Justifications: Experimental Examination of Peremptory Use and the Batson Challenge Procedure*, 31 Law & Hum. Behav. 261, 266–67 (2007).
[3] Mr. Batson had to insist that his counsel "object anyway" to the prosecutor's use of peremptory challenges during jury selection at his trial. Sean Rameswaram, *Object Anyway,*

are reluctant to sustain such objections. *Cf. People v. Gutierrez*, 2 Cal. 5th 1150, 1183, 395 P.3d 186, 208 (2017) (Liu, J., concurring) ("[I]t is more likely than not that one or more strikes were improperly motivated. But I do not think the finding of a violation should brand the prosecutor a liar or a bigot. Such loaded terms obscure the systemic values that the constitutional prohibition on racial discrimination in jury selection is designed to serve.").

¶ 114　　Appellate judges are similarly uncomfortable overturning jury verdicts, especially when the crimes charged are extremely serious. The fact that the first time this Court has ever vacated a conviction on *Batson* grounds occurs here where Mr. Clegg has already completely served his time is indicative of why the *Batson* framework has failed to adequately address the constitutional violation acknowledged by the United States Supreme Court in *Strauder v. West Virginia,* 100 U.S. 303, 310 (1880).

¶ 115　　Indeed, in 1986 Justice Marshall stated that "[t]he decision today will not end the racial discrimination that peremptories inject into the jury-selection process. That goal can be accomplished only by eliminating peremptory challenges entirely." *Batson*, 476 U.S. at 102–03 (Marshall, J., concurring). The Arizona Supreme Court has taken this observation seriously and, by general rule, has eliminated the use of

More Perfect Podcast (July 16, 2016), interview of James Batson, https://www.wnycstudios.org/podcasts/radiolabmoreperfect/episodes/object-anyway.

peremptory challenges in civil and criminal trials. *See* Order Amending Rules 18.4 and 18.5 of the Rules of Criminal Procedure, and Rule 47(e) of the Rules of Civil Procedure, Ariz. Sup. Ct. No. R-21-0020 (Aug. 30, 2021). Washington State's General Rule 37, adopted by the Washington Supreme Court in 2018, establishes a new standard and identifies presumptively invalid reasons for peremptory challenges that have been associated with improper discrimination in the past. Wash. Gen. R. 37(i); *see also State v. Jefferson*, 192 Wash. 2d 225, 242, 429 P.3d 467, 476 (2018) (identifying *Batson's* deficiencies and asserting the court's "inherent authority to adopt such procedures to further the administration of justice"). The Connecticut Supreme Court established a jury selection task force to review the problems with *Batson* that it carefully outlined in its opinion in *State v. Holmes*, 334 Conn. 202, 221 A.3d 407 (2019), and to propose necessary solutions. *See Holmes*, 334 Conn. at 250, 221 A.3d at 436–37.

¶ 116          Social science research indicates that

> compared to diverse juries, all white juries tend to spend less time deliberating, make more errors, and consider fewer perspectives. In contrast, diverse juries were significantly more able to assess reliability and credibility, avoid presumptions of guilt, and fairly judge a criminally accused. By every deliberation measure heterogeneous groups outperformed homogeneous groups. These studies confirm what seems obvious from reflection: more diverse juries result in fairer trials.

*Id.* at 235 (cleaned up) (quoting *Saintcalle*, 178 Wash. 2d at 50, 309 P.3d at 337).[4] As in other jurisdictions, "this appeal presents us with an occasion to consider whether further action on our part is necessary to promote public confidence in the perception of our state's judicial system with respect to fairness to both litigants and their fellow citizens." *Id.* at 236. If we are to give more than lip service to the principle of equal justice under the law, we should not bury our heads in the sand and pretend that thirty-five years of experience with *Batson* will magically change. There are a variety of tools at our disposal, we urgently need to use them.

---

[4] *See, e.g.,* Samuel R. Sommers & Phoebe C. Ellsworth, *How Much Do We Really Know About Race and Juries? A Review of Social Science Theory and Research,* 78 Chi.-Kent L. Rev. 997 (2003); Samuel R. Sommers, *Determinants and Consequences of Jury Racial Diversity: Empirical Findings, Implications, and Directions for Future Research,* 2 Soc. Issues & Pol'y Rev., no. 1, 2008, at 65–102; Samuel R. Sommers, *On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations*, 90 J. of Personality & Soc. Psych., no. 4, 2006, at 597–612.

Justice BERGER dissenting.

"[T]he back and forth of a *Batson* hearing can be hurried, and prosecutors can make mistakes when providing explanations [for the use of peremptory challenges]. That is entirely understandable, and *mistaken explanations should not be confused with racial discrimination*." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2250, 204 L. Ed. 2d 638, 663 (2019) (emphasis added). This is plainly apparent because "*Batson* prohibits purposeful discrimination, not honest, unintentional mistakes." *Aleman v. Uribe*, 723 F.3d 976, 982 (9th Cir. 2013).

Trial court judges are uniquely positioned to consider and evaluate whether peremptory strikes are the product of purposeful discrimination. The Supreme Court has "recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province." *Flowers*, 139 S. Ct. at 2244, 204 L. Ed. 2d at 656 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S. Ct. 1203, 1208 (2008)). Because "the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson v. Kentucky*, 476 U.S. 79, 98 n.21, 106 S. Ct. 1712, 1724 n.21 (1986).

Consistent with precedent, the trial court evaluated the explanations provided by the prosecutor for the strikes of Ms. Viola Jeffreys and Ms. Gwendolyn Aubrey. Based upon the entire record, the trial court determined that the mistaken

explanation provided was indeed "an instance of a prosecutor misremembering," not purposeful discrimination. The majority agrees that the explanation provided by the prosecutor was a mistake, yet reaches its desired result by distorting precedent, and mischaracterizing the record and the trial court order.

¶ 120 The question presented by this case is whether a mistaken explanation offered by an attorney during step two of a *Batson* inquiry is sufficient for the opponent of a peremptory strike to demonstrate purposeful racial discrimination. The mistaken explanation provided by the prosecutor cannot, by definition, be purposeful discrimination.

¶ 121 Because the trial court's order should be affirmed, I respectfully dissent.

## I. Factual Background

¶ 122 There is no question in this case as to defendant's guilt.[1] It is uncontroverted that on January 25, 2014, defendant robbed a Wake County business at gun point. Defendant threatened to kill the employee, a black female, and he pointed a firearm at her stomach. After only receiving $85 from the cash register, defendant pressed the firearm against the employee's neck. Defendant then noticed a safe, and he pointed the firearm at the employee's left temple and ordered her to open it. Defendant fled the scene when the employee did not have the combination to the safe.

---

[1] The only two arguments made by defendant in the Court of Appeals concerned the *Batson* argument at issue here, and his contention that the victim-impact testimony was not relevant.

¶ 123      Defendant was tried and convicted of robbery with a dangerous weapon. During jury selection, defendant objected to use of peremptory challenges by the prosecutor against two black females, Ms. Viola Jeffreys and Ms. Gwendolyn Aubrey. The prosecutor struck Ms. Jeffreys due to her work history with Dorothea Dix Hospital. When the prosecutor explained his strike of Ms. Aubrey, the prosecutor provided a mistaken explanation. The prosecutor said that "when I asked her if she could be fair and impartial, her answer was 'I suppose.' I wasn't confident that she was confident that she could be fair and impartial." The problem, however, is that Ms. Aubrey was not asked if she could be fair and impartial; instead, Ms. Aubrey answered "I suppose" when responding to a question concerning her ability to focus during the trial.

## II. Analysis

¶ 124      Peremptory challenges "are challenges which may be made or omitted according to the judgment, will, or caprice of the party entitled thereto[.]" *State v. Smith*, 291 N.C. 505, 526, 231 S.E.2d 663, 676 (1977). "The essential nature of the peremptory challenge denotes that it is a challenge exercised without a reason stated, without inquiry and without being subject to the court's control." *Id.* Peremptory challenges "permit rejection for a real or imagined partiality," *id.*, subject to the limitations set forth in the *Batson* line of cases.

¶ 125    Under *Batson*, "[o]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two)." *Purkett v. Elem*, 514 U.S. 765, 767, 115 S. Ct. 1769, 1770–71 (1995). "The ultimate inquiry is whether the State was 'motivated in substantial part by discriminatory intent.'" *State v. Hobbs*, 374 N.C. 345, 353, 841 S.E.2d 492, 499 (2020) (quoting *Foster v. Chatman*, 578 U.S. 488, 513, 136 S. Ct. 1737, 1754 (2016)).

¶ 126    It is in step three of the *Batson* analysis that the trial court determines whether purposeful discrimination was the motivation for the peremptory strike. *Flowers*, 139 S. Ct. at 2241, 204 L. Ed. 2d at 655. "It is the honesty of the prosecutor's explanation—and that alone—which a trial judge must assess at the third step of the *Batson* analysis." *Lamon v. Boatwright*, 467 F.3d 1097, 1102 (7th Cir. 2006).

¶ 127    "As in any equal protection case, the 'burden is, of course,' on the defendant who alleges discriminatory selection of the venire 'to prove the existence of purposeful discrimination.'" *Batson*, 476 U.S. at 93, 106 S. Ct. at 1721 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550, 87 S. Ct. 643, 646–47 (1967)). The burden of proof "rests with, and never shifts from, the opponent of the strike." *Johnson v. California*, 545 U.S. 162, 171, 125 S. Ct. 2410, 2417 (2005) (quoting *Purkett*, 514 U.S. at 768, 115 S. Ct. at 1769 (per curiam)).

¶ 128 A "trial judge's assessment of the prosecutor's credibility is often important." *Flowers*, 139 S. Ct. at 2243–44, 204 L. Ed. 2d at 656. The Supreme Court has "recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province." *Id.* at 2244, 204 L. Ed. 2d at 656 (quoting *Snyder*, 552 U.S. at 477, 128 S. Ct. at 1208). "On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder*, 552 U.S. at 479, 128 S. Ct. 1203; *accord State v. Lawrence*, 352 N.C. 1, 14, 530 S.E.2d 807, 816 (2000). This Court has stated that "where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *State v. Thomas,* 329 N.C. 423, 433, 407 S.E.2d 141, 148 (1991) (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S. Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985)); *see also Hobbs*, 374 N.C. at 366–67, 841 S.E.2d at 508 (Newby, J., dissenting).

¶ 129 Because "the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson*, 476 U.S. at 98 n.21, 106 S. Ct. 1712 n.21; *see also Flowers*, 139 S. Ct. at 2244, 204 L. Ed. 2d at 656 ("The [Supreme] Court has described the appellate standard of review of the trial court's factual determinations in a *Batson* hearing as highly deferential.) (cleaned up); *Foster,* 578 U.S. at 500, 136 S. Ct. at 1747 (the third step "turns on factual determinations, and, in the absence of exceptional circumstances, we defer to state court factual findings unless we conclude

that they are clearly erroneous.") (cleaned up); *Hernandez v. New York*, 500 U.S. 352, 364, 368 111 S. Ct. 1859, 1868–69, 1871 (1991) (discussing the Supreme Court's "respect for factual findings made by state courts" and the "deference to state-court factual determinations, in particular on issues of credibility."); and *Lawrence*, 352 N.C. at 14, 530 S.E.2d at 816 (because the third *Batson* step "is essentially a question of fact, the trial court's decision as to whether the prosecutor had a discriminatory intent is to be given great deference[.]").

**A. Viola Jeffreys**

Again, the two prospective jurors at issue here are Ms. Viola Jeffreys and Ms. Gwendolyn Aubrey. Ms. Jeffreys was struck due to her work history with Dorothea Dix Hospital. The relevant portions of the transcript are set forth below.[2]

> THE COURT: Ms. Jeffreys, can you tell us about yourself, ma'am?
>
> [Ms. Jeffreys]: I live on [REDACTED].
>
> . . . .
>
> THE COURT: And do you work, employed, either at home or outside the home?
>
> [Ms. Jeffreys]: No, retired.
>
> THE COURT: What type of work did you do before you retired?

---

[2] The trial court initially questioned prospective jurors before allowing the parties to engage in voir dire.

[Ms. Jeffreys]: I was a nurse aide at Dorothea Dix.

. . . .

[The State]: Ms. Jeffreys, I'm going to call you out. I wanted to ask you about your work as a nurse's aide, is that right, at Dorothea Dix?

[Ms. Jeffreys]: Dorothea Dix, yes.

[The State]: How long did you do that?

[Ms. Jeffreys]: 14 years.

[The State]: And when did you stop working there?

[Ms. Jeffreys]: I stopped there about seven months ago.

[The State]: You stopped working there about seven months ago?

[Ms. Jeffreys]: It had been about two years. I'm sorry. About two years.

[The State]: About two years ago was when you stopped working at Dorothea Dix? And I guess I kind of know what a nurse's aide does, but can you elaborate a little bit?

[Ms. Jeffreys]: They care of the patient. We give them baths and make sure they take medicine, stuff like that.

[The State]: What type of ailments and –

[Ms. Jeffreys]: Mostly diabetes. . . . Patients that have diabetes or something like that.

¶ 131      It is uncontroverted that defendant argued pretrial motions related to his mental health issues.  During voir dire, the prosecutor explained that he struck Ms. Jeffreys because of "the underlying issues that have been brought out so far, I found that maybe she would not be able to fairly assess the evidence in this case."  On remand, the prosecutor provided the same basis for use of the peremptory challenge— that based on mental health issues put forth by defendant, Ms. Jeffreys may be sympathetic to defendant's case because of her work history at a mental health institution.

¶ 132      The trial court found that the prosecutor had provided a race-neutral reason for striking Ms. Jeffreys "based upon [her] employment history as a nurse's aide at Dorothea Dix Hospital."  The trial court further found that "[d]efendant's competency had been called into question and evaluations ordered [, and] the State's stated basis for striking Ms. Jeffreys due to her work history in the mental health field is rationally related to [d]efendant's potential competency issues."  Finally, the trial court found that the reason for striking Ms. Jeffreys was "supported by the record and constitutes an appropriate justification for the strike."

¶ 133      The prosecutor's questions of Ms. Jeffreys were focused on her work at Dorothea Dix, which was a state-operated psychiatric hospital.  Ms. Jeffreys was the only prospective juror who indicated she worked or had worked in a mental health facility.

¶ 134        In overruling defendant's *Batson* challenge as it relates to Ms. Jeffreys, the

trial court concluded as a matter of law that defendant "had not established that it is

more likely than not that the State engaged in purposeful discrimination[.]" The trial

court's determination as to Ms. Jeffreys was not clearly erroneous and should be

affirmed.

¶ 135        The majority mentions Ms. Jeffreys more than thirty times in its opinion, but

they do not analyze or even consider the legitimate reasons for her strike because

doing so destroys their narrative. To be clear, there is no determination by the

majority that the prosecutor's strike of Ms. Jeffreys was motivated by race. However,

the majority uses carefully selected portions of the record, including Ms. Jeffreys's

demographic information, to lump her in with the discussion of Ms. Aubrey, implying

that both strikes were based on race. While the cherry-picked facts and

circumstances may be helpful to their desired result, analysis of Ms. Jeffreys' strike

is required for a proper review. *See Flowers*, 139 S. Ct. at 2251, 204 L. Ed. 2d at 664

(in a *Batson* analysis, an appellate court is to review "all of the relevant facts and

circumstances taken together."); s*ee also State v. Bennett*, 374 N.C. 579, 339 (2005)

("clear error" review is based "on the entire evidence.").[3] The majority's failure to

---

[3] The majority actually quotes this portion of *Bennett* in its analysis, yet declines to analyze the strike of Ms. Jeffreys.

include an intellectually honest analysis of Ms. Jeffreys' strike demonstrates just one reason why the opinion is jurisprudentially suspect.

**B. Gwendolyn Aubrey**

¶ 136        Similarly, defendant has failed to demonstrate purposeful discrimination in the use of a peremptory challenge for prospective juror Ms. Gwendolyn Aubrey. When the prosecutor explained his strike of Ms. Aubrey, the prosecutor provided a mistaken explanation. The prosecutor said that "when I asked her if she could be fair and impartial, her answer was 'I suppose.' " I wasn't confident that she was confident that she could be fair and impartial." The voir dire of Ms. Aubrey is set forth below.[4]

> THE COURT:        Ms. Aubrey, can you tell us a little bit about yourself, ma'am?
>
> [Ms. Aubrey]:        I live in south Raleigh. I work in the food service industry. I've not served on a jury before.
>
> THE COURT:        Married? Single?
>
> [Ms. Aubrey]:        Single.
>
> . . . .
>
> THE COURT:        And anything going on in your life that would make it difficult or impossible for you to serve?
>
> [Ms. Aubrey]:        Other than missing work, no.

---

[4] As with Ms. Jeffreys, the trial court initially questioned prospective jurors before allowing the parties to engage in voir dire.

THE COURT:     Missing work. Yes, ma'am. You work daytime?

[Ms. Aubrey]:     Day and night.

THE COURT:     Yes, ma'am. All right. There will be more questions about that, I'm sure, but thank you for bringing that concern to our attention.

. . . .

[The State]:     As far as the new potential jurors, any of you ever been the victim of a crime before? Friends or family ever been the victim of any crime? . . .

[Ms. Aubrey]:     I had my car broken into once.

[The State]:     And you said you did or somebody—

[Ms. Aubrey]:     I did.

[The State]:     Can you say when that was?

[Ms. Aubrey]:     I don't know. Maybe like late '90s.

[The State]:     Okay. Did you have any of your belongings taken from you?

[Ms. Aubrey]:     Yes, sir, I did.

[The State]:     Do you know if anybody was charged?

[Ms. Aubrey]:     No.

[The State]:     Did you ever get any of your belongings back?

[Ms. Aubrey]:    No.

[The State]:    Was it reported to law enforcement?

[Ms. Aubrey]:    No, sir, it wasn't.

[The State]:    It was not reported? Okay.

. . . .

[The State]:    Can you tell me just a little bit about how you're familiar with firearms?

[Ms. Aubrey]:    I had an ex-boyfriend who was a gun enthusiast and taught me how to shoot a gun.

[The State]:    Do you own any firearms now?

[Ms. Aubrey]:    No, sir.

[The State]:    Do you ever shoot or handle weapons, firearms, now?

[Ms. Aubrey]:    No, sir.

. . . .

[The State]:    Okay. And Judge Ridgeway asked you about things going on in your life, and I just want to kind of follow up on that. We all have our normal responsibilities in life. Is there anything going on in your personal life—and I don't need to know specifically—you know, that would maybe take you away mentally from being engaged in what's going on here in the courtroom? Again, I don't need to know specifics, but, you know, is there a possibility that your mind could drift somewhere

else when we need you to be focusing on the proceedings here?

. . . .

[The State]: Okay. Ms. Aubrey, do you feel confident you can focus on what's going on here?

[Ms. Aubrey]: I suppose.

[The State]: I want you to be confident about it. You just don't want to be a juror or do you feel like if you were here, you could focus and do what we need you to do?

[Ms. Aubrey]: I think so.

[The State]: Okay. Thank you.

¶ 137    The State then excused Ms. Aubrey from the panel. Defense counsel objected to the use of peremptory challenges against Ms. Jeffreys and Ms. Aubrey, stating, "[t]he only distinction I see is color."

¶ 138    The prosecutor then argued to the trial court:

Judge, what I would tell you, first of all, I want to note that I think it's very offensive that there's an allegation being made that I'm excusing jurors for racial reasons. What I can tell you is that both the potential jurors in Seat No. 5, body language to me, they would not look at me. The most recent juror, Ms. Jeffreys—excuse me. Ms. Jeffreys was the first juror. The most recent juror, when I asked her if she could be fair and impartial, her answer was "I suppose." I wasn't confident that she was confident that she could be fair and impartial. The first juror, Ms. Jeffreys, talked about her experience as a nurse's aide with Dorothea Dix. With some of the underlying issues that have been brought

out so far, I found that maybe she would not be able to fairly assess the evidence in this case.

As Ms. Darrow pointed out, there's been an equal number of white jurors and African-American jurors that have been excused. Based on their answers, based on their body language, based on their failure to look at me when I was trying to communicate with them, and also based on their answers with respect to the last juror, her not being confident that she could be fair and impartial, frankly, I think that would be potential reason to challenge her for cause.

Other than that, Judge, that's how the State is viewing the excusal of those jurors.

¶ 139     At trial, the objection lodged by defense counsel was overruled. Upon remand, the trial court found that "[i]t is evident from the record that both the trial court and the prosecutor's memory of the answers given by Ms. Aubrey [were] conflated." The trial court further found that

> [i]n retrospect, had the prosecutor, in offering his race-neutral basis for exercising the strike of Ms. Aubrey, stated that he was concerned that she had answered "I suppose" to the question of whether she could focus, when coupled with her concern that she worked "day and night" and would miss work, that, in the Court's view, would have constituted a neutral justification for the strike.

¶ 140     In other words, the prosecutor and the trial court were mistaken about the question posed by the State and the response given by Ms. Aubrey, and that but for the mistaken explanation, the record revealed that there was a race-neutral explanation for the strike of Ms. Aubrey. This portion of the trial court's order is far different from what the majority characterizes as the trial court "rejecting the 'I

suppose' rationale." Nonetheless, the trial court, citing *Miller-El v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317 (2002), determined that it could not consider the incorrectly stated, but plainly apparent, reason for striking Ms. Aubrey.

¶ 141    The trial court then analyzed other reasons proffered by the prosecutor for the strike, including body language and lack of eye contact by Ms. Aubrey, purported disparities in use of peremptory challenges,[5] and a comparison of the questions posed to white and black prospective jurors.[6] As to body language and lack of eye contact, the trial court made no findings of fact during the original trial. Citing *Snyder v. Louisiana*, 552 US 472 (2008), the trial court determined that in the absence of a finding of fact on a prospective juror's demeanor, the State's race-neutral explanation for striking Ms. Aubrey had to fail.

---

[5] The trial court also referenced a study of peremptory challenges in capital trials from 1990 to 2010 and non-capital cases from 2011–2012 in paragraphs 18 and 22. One could argue that this data is stale. Both of these studies are more than ten years old, and, presumably, some of the data used in the capital case study is more than thirty years old. Certainly, North Carolina's people, population, and attitudes have changed over the last thirty years. The majority seemingly acknowledges this point in footnote 9. Perhaps it is time for an updated, independent study of jury selection commissioned by the Administrative Office of the Courts.

[6] It seems obvious, but jury selection typically involves general questioning of prospective jurors to probe basic information. Based on responses, individual prospective jurors may, not shall, receive follow-up questions. The majority focuses on disparate questioning in its findings. However, "disparate questioning or investigation alone does not constitute a *Batson* violation." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2248, 204 L. Ed. 2d 638, 661 (2019). The proper standard is "dramatically disparate questioning" *id.*, which is not present here.

¶ 142    While the trial court may have taken the holding in *Miller-El* too literally when it determined that it could not consider the mistaken explanation provided by the prosecutor, the trial court's ultimate conclusion was correct.  The trial court clearly set forth its reasoning, making the types of credibility determinations contemplated by the Supreme Court of the United States and by this Court, and the trial court's decision is entitled to great deference.

¶ 143    The majority acknowledges what is plainly apparent from the record and the trial court's order - that the prosecutor's explanation for the strike of Ms. Aubrey was a "mistake."  If "*Batson* and its progeny direct trial judges to assess the *honesty*-not the accuracy-of a proffered race-neutral explanation," *Lamon,* 467 F.3d at 1101(emphasis in original), and the majority acknowledges this was a mistake, the strike cannot be the result of purposeful discrimination.  *See Bethea v. Commonwealth*, 297 Va. 730, 754, 831 S.E.2d 670, 682 (2019) (a "prosecutor's race-neutral reason cannot at the same time be both an unintentional mistake and a pretextual, purposeful misrepresentation.").

¶ 144    Defendant has not shown purposeful discrimination or bad faith in the prosecutor's mistaken explanation; it is only theorized by the majority.  Yet, the majority finds the prosecutor's mistaken explanations here were "shifting" and "plainly unsupported by the record."  The majority then erroneously postulates that because the race-neutral explanations failed, the only remaining evidence must be

given weight and that it must be assigned to defendant. It is the factfinder that assigns weight to evidence, and the factfinder can assign as much or as little weight as it determines appropriate. That is not a higher burden.

¶ 145    Moreover, the majority's disparate questioning analysis is internally inconsistent. The majority here expressly recognizes that there is an explanation for the prosecutor's questioning of Mr. Williams that "is not completely without merit." Indeed, the trial court found that the side-by-side comparison between Mr. Williams and Ms. Aubrey was not "particularly pertinent" as Mr. Williams had previously mentioned he could juggle things around while Ms. Aubrey "did not indicate any flexibility in her 'day and night' work schedule that might ease her concern about missing work." This should be dispositive as to any further analysis given the well-established deferential standard of review that this Court is required to apply. But, the majority again impermissibly speculates and draws its own inferences from the cold record rather than deferring to the findings of the trial court. In so doing, the majority encroaches on the authority vested in the trial court.

¶ 146    To be sure, "[e]qual justice under law requires a criminal trial free of racial discrimination in the jury selection process." *Flowers*, 139 S. Ct. at 2242, 204 L. Ed. 2d at 655. But this Court is not equipped, nor is it our role, to find facts and weigh evidence. Even if one were to assume this is a close case, which it is not, "where there are two permissible views of the evidence, the fact-finder's choice between them

cannot be clearly erroneous." *State v. Thomas,* 329 N.C. 423, 433, 407 S.E.2d 141, 148 (1991) (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985)); *see also Hobbs*, 374 N.C. at 366–67, 841 S.E.2d at 508 (Newby, J., dissenting).

### III. Conclusion

¶ 147      From its unique position, the trial court observed the strikes of Ms. Jeffreys and Ms. Aubrey and heard the explanations for the strikes offered by the State. In a comprehensive order, the trial court made detailed findings of fact and conclusions of law, ultimately overruling defendant's objections to the peremptory strikes. The majority, however, declines to give the trial court any measure of deference, adopting its own view of the evidence. In so doing, the majority ignores the caution advised by the Supreme Court that "mistaken explanations should not be confused with racial discrimination." *Flowers*, 139 S. Ct. at 2250, 204 L. Ed. 2d at 663.

Chief Justice NEWBY and Justice BARRINGER join in this dissenting opinion.